[No. 29396. Department Two. December 29, 1944.]

FRANK HUBER, *Respondent*, v. MARJORIE VERA ROSING, *Appellant*.[1]

*John B. Adams*, for appellant.

*W. L. Hyndman*, for respondent.

BEALS, J.—This action was instituted by Frank Huber, as plaintiff, against Marjorie Vera Rosing, as defendant. Plaintiff demanded judgment for damages against defendant in the sum of $490, four hundred dollars as compensation for alleged damages suffered by plaintiff because of injuries to his auto truck, the balance for loss of use of the truck for eighteen days.

In his complaint, plaintiff alleged that the accident was the result of defendant's negligence, and demanded damages as above stated. Defendant answered the complaint, denying the allegation of negligence on her part, and, by way of an affirmative defense and cross-complaint, alleged that the accident was due to the negligence of the driver of plaintiff's car, and demanded judgment against plaintiff for damages to defendant's car, on account of personal in-

[1]Reported in 154 P. (2d) 609.

juries to herself, and for other special damages, in the aggregate amount of five thousand dollars.

Plaintiff having denied the affirmative allegations in defendant's answer, the action was tried to the court sitting without a jury, and resulted in the entry of findings of fact and conclusions of law in plaintiff's favor, followed by a judgment against defendant in the sum of $389.84, from which judgment defendant has appealed.

Appellant assigns error upon the court's alleged finding that at the time of the accident respondent was engaged upon a mission on behalf of appellant, and that appellant was responsible to respondent for damages arising out of the collision, regardless of negligence. Appellant also assigns error upon the court's finding No. 8, which reads as follows:

"That the damages suffered by the plaintiff was solely because of the negligence on the part of the defendant. That if any emergency was created or existed, the same was brought about through the negligence of the defendant in operating her car at a speed in excess of that permitted in the restrictive zone, which speed is indicated by the nature of the damages suffered by the cars involved in the accident;"

and in entering judgment in favor of respondent.

Appellant also assigns error upon the refusal of the trial court to award her judgment against respondent for damages, as demanded in her cross-complaint.

The parties to this action both reside at Copalis Beach, where appellant operates a tavern. In the course of the evening of Saturday, April 17, 1943, appellant decided to use her automobile to transport several of her friends, including some servicemen, to Ocean City, about three miles south of Copalis, where a dance was to be held. It developed that more persons desired to go to the dance than could be accommodated in appellant's car, and appellant, therefore, suggested to respondent that his pickup truck be also pressed into service. Respondent at first declined to allow his truck to be used, but, when it was suggested that Miss Evalena Gaten would act as driver of the truck, he consented. It was arranged that respondent and appellant

would both be members of the party, and that respondent would ride in appellant's car.

In due time the two cars started on the journey, respondent's truck leading the way, followed by appellant's 1941 Oldsmobile sedan. Miss Gaten was driving the truck; sitting beside her on the driver's seat were respondent's stepmother, Mary Huber, and two members of the United States coast guard, one holding the other on his knees. Corporal Bagby, of the United States army, was driving appellant's car. Sitting next to him was appellant, and on her right the respondent. On the rear seat were Lucille Gill, her sister, and two servicemen. It seems to have been anticipated that other servicemen who might be met walking along the highway toward Ocean City would be picked up by the two cars.

The highway along the beach is a county road running in a generally northerly and southerly direction. It has a hard surface about eighteen feet in width. The pavement is bordered by gravel and grass shoulders, each sloping toward a ditch. The shoulders afforded sufficient space to support a car parked entirely off the hard surface of the road. At the time of the accident, the area in question was under United States military supervision. The authorities had ordered a partial blackout, the use of car headlights of more than two hundred fifty candle power after nightfall having been prohibited. The speed of automobiles was limited to fifteen miles per hour.

The night was dark and rainy, and visibility was limited. About halfway to Ocean Beach, the occupants of respondent's truck saw four soldiers walking along the road toward the south. Deciding to offer these men a ride, Miss Gaten brought the truck to a stop on the highway and backed the car off the hard surface of the road onto the shoulder at a point directly opposite the walking soldiers, whom she invited to board the truck. When the car stopped the two left wheels rested on the edge of the hard surface. Two of these men climbed into the truck box and the other two were in the act of entering it, when appellant's car

crashed into the rear of the truck, damaging both cars and inflicting some injuries upon the occupants.

The only finding of negligence made by the trial court is contained in finding No. 8, *supra,* and that finding is limited to the fact that appellant's car was moving at a speed in excess of fifteen miles an hour, the maximum speed fixed for the restrictive zone in which the cars were operating. That speed was fixed not by the state or any municipality as a regulation of traffic, but by military authorities for military reasons. The court made no finding of actual negligence in the speed of the car, but that the negligence consisted in exceeding the speed permitted in the restrictive zone.

It was apparently assumed before the trial court, and we assume for the purposes of this opinion, without deciding, that the military regulations above referred to have the same effect as a state or a city legislative enactment, in so far as civilian traffic is concerned.

The record contains no evidence as to what would constitute a reasonable rate of speed for automobiles upon the road in question at the time of the accident, under conditions then existing.

Respondent introduced no evidence concerning the speed at which appellant's car was moving at or prior to the time of the accident. While respondent was a passenger riding in the front seat of appellant's car, he testified that he did not see the truck prior to the collision; that he was paying no attention to what was going on, save that he remembered it was dark and rainy. The soldier who was driving appellant's car had left the country prior to the trial and was not available as a witness. The witnesses who did testify concerning the speed of appellant's car stated that it was moving at about fifteen miles an hour. Robert Chabot, who was driving south along the highway not far behind appellant's car, testified that he was moving at about fifteen miles an hour, and that he could see the rear lights of appellant's car all the time, "so she could not have been going very fast either, or she would have gotten out of my sight." This witness further testified that appellant's car at all

times remained about the same distance ahead of his car, so far as he could see. Mrs. Chabot's testimony was to the same effect.

The record contains no direct evidence that appellant's car was traveling in excess of fifteen miles per hour.

By the finding above quoted, the trial court stated that excessive speed was indicated by the "nature of the damages suffered by the cars involved in the accident." This court has several times considered the damage suffered by an automobile in connection with the determination of the question of excessive speed. In the case of *Oyster v. Dye,* 7 Wn. (2d) 674, 110 P. (2d) 863, 133 A. L. R. 720, which was a case involving a collision between a passenger automobile and a truck, this court considered the testimony of one who was extremely familiar with automobiles, who had been called as a witness by respondents and had been permitted to testify, over the objection of appellants, as to his opinion concerning the speed of appellant's car prior to the impact, his testimony having been based upon his examination of photographs of the two cars taken after the collision. This court held that the witness was not qualified to testify as an expert, and that the admission of his testimony was reversible error, the testimony amounting "to no more than an estimate or guess by a witness not qualified to testify as an expert." In the course of the opinion we said:

"This court has held that, in certain cases, the force or violence of a collision between a motor vehicle and a person, another vehicle, or any other object, may be considered in estimating speed. [Citing cases.] This, of course, is proper in many instances, as the result of a collision may indicate the speed of a colliding car, and evidence concerning the situation after a collision may always be considered by the trier of the facts, the facts being given such weight as is proper under the circumstances."

In the case at bar, there was no direct evidence as to the speed of appellant's car, except the testimony of appellant's witnesses above referred to. The trial court disregarded this testimony and based its findings as to appellant's negligence solely upon the extent and nature of the damage

suffered by the cars as the result of the collision. In other words, the extent of the damage was taken as indicative of the force of the impact, and the force of the impact was considered a sufficient basis for a finding that appellant's car had been moving at excessive speed.

No witness, expert or nonexpert, attempted to estimate the speed of appellant's car, basing his testimony upon the damage suffered by the cars as the result of the collision. The trial court, from the evidence referred to only, reached the conclusion which resulted in the finding of excessive speed.

There might indeed be instances in which the results of a collision might be so slight or so serious that as matter of common knowledge it could be said that slight or considerable force had been exerted, but the case at bar falls within no such classification.

In the case of *Hauswirth v. Pom-Arleau,* 11 Wn. (2d) 354, 119 P. (2d) 674, is found the following:

"The nature of an impact and the violence of a collision, together with its results, may be taken into consideration in connection with all the other circumstances in determining the rate of speed of a colliding vehicle."

The rule laid down in the case last cited is to the effect that the evidence referred to may be considered by the trier of the facts in connection with all other circumstances (including, of course, direct testimony as to speed).

The trial court, as definitely stated in the finding, based the finding of negligence upon the damages suffered by the two cars as the result of the accident. Concerning the damage to respondent's truck, respondent testified:

"A. My car was wrecked. It looked like a total loss to me when I first saw it. Q. How about the frame? A. It was all bent. Q. How about the axles? A. They were sprung. Q. How about the supports for the frame? The engine? A. The engine was all right. Q. What did they do to the frame, or body, when they went to repair this car? A. They had to take it all apart; had to take the cab off and everything and built the whole frame up. Q. After the repairs were made to your automobile was it as good as it was before the wreck? A. About the same, I guess. I haven't seen any difference."

Mrs. Mary Huber, respondent's stepmother, on direct examination testified:

"Q. What shape was it [the truck] in? A. Our car, the body was standing up straight, bent up and bent right into the cab,"

while on cross-examination she said:

"Q. You say that the body on your car was bent up? By the body you mean the box on the back? A. No, the frame. The frame was bent double and the body was smashed in, clear to the cab. Q. You noticed that right away? A. Yes. Q. How did you happen to see that? A. We couldn't close the front door and the cab was smashed in. The body was smashed in through the cab to keep us from closing the door. Q. You gathered from that that the frame was bent up? A. I didn't. Not at that time, no. Q. You didn't know at that time what condition the car was in, as to the frame? A. Not the frame. The body was all standing straight up in the air. About the frame, we didn't know that until we got it in the shop. Q. Are you talking about the box in the back? A. Yes, we had a pickup, and the box at the back was smashed clear into the cab of the truck. Q. What is that box made of? A. I guess out of wood."

Miss Gaten, the driver of respondent's truck, referring to its condition after the accident, testified:

"A. Well, after a while I looked at it and it looked like a chariot, it was bent down in the center. A. And curved up? A. Bent up on both ends, yes. Q. Was the cab busted? A. I couldn't tell much about the cab. The door wouldn't shut."

This witness, however, in response to further questions, stated that after the accident she drove the truck under its own power first on to Ocean City and then back to Copalis.

Concerning the damage to appellant's car, Mr. H. C. Hansen, the service manager of the garage which repaired it, testified:

"Q. Was that machine brought into your shop in Aberdeen during April of 1943? A. Yes. Q. What was the general condition of the automobile at that time? A. Complete front end smashed up on it. Q. And in a general way can you tell the court what parts were damaged? A. The front end was hit apparently right smack in the front, the radiator

grill, the radiator hood, both front fenders, front bumper, front frame, horn and part of the cowl right next to where the hood fastens in front of the windshield. Q. Was that damaged below or above the bumper line? A. Just above the bumper line on the top bumper guards."

At the instant of the collision, Miss Gaten had her foot on the brake of the truck. This, of course, caused the truck to offer more resistance to the blow received from the automobile than would have been present if the truck's wheels had been free to move forward. After the accident, the truck was headed directly south, standing on the shoulder of the road, save that its left wheels were resting on the hard surface, apparently in the same relative position it occupied before the collision. There was evidence to the effect that appellant's car struck the truck to the left of the center, and that after the accident appellant's automobile was inclined slightly toward the ditch on the right of the road, the rear portion of the car resting on the surface, the cars being about five feet apart. Concerning the position of the cars after the accident, Mrs. Huber testified:

"Q. Did you see the cars after the collision? A. Yes. Q. Where were they? A. Ours was pushed kind-of pushed ahead a ways when they hit us; pushed our car ahead of us. . . . Q. And how far apart were the cars? A. Oh, her car, Mrs. Rosing's car was aways back from our car. Q. How far about? A. About five feet or so."

As to the force of the impact, Miss Gaten testified:

"Q. Did the force of the impact move your truck? A. Yes, it did. Q. How far? A. I couldn't say just how far but I could feel it shoved ahead."

Concerning the force of the collision as revealed by the damage to appellant's car, Mr. Hansen testified:

"Q. Was the engine knocked off its house, or support blocks? A. The motor on the nose is rubber mounted and doesn't take much to kick the rubber out of place. They were replaced, the rubber mounting. Q. What about the hood, was that pretty badly smashed? A. The front end of the hood, yes. Q. You say it took quite an impact. You mean it would have to hit an object with terrific force? Mr. Lawwill: Just a minute— Q. He said it took quite an

impact. A. No it was hit square from the front. Q. Would it have to be hit with a terrific force in order to do that? A. Not such a hard blow. It would be hard to determine that because the front end of automobiles nowadays are all peuter. The fenders are very easily bent."

Apparently no tire on either car was damaged. The truck was still in condition to operate, as Miss Gaten drove it approximately four and one-half miles after the collision. No occupant of either car, save appellant, was seriously injured.

The foregoing epitomizes the evidence concerning the damage to the automobiles and the force of the collision.

■ In the case of *Proper v. Brenner*, 191 Wash. 540, 71 P. (2d) 389, we said:

"It is often dangerous to arrive at conclusions from mere physical facts. It is, for example, rarely, if ever, safe to attempt to judge the rate of speed from a consideration of the amount of physical damage done; but there are situations where physical facts are controlling."

In the case cited it was held that the absence of tire marks on the soft shoulder of a highway immediately after an accident proved that the injured pedestrian had been struck on the hard surface of the highway.

In 10 Blashfield, Cyclopedia of Automobile Law & Practice (Perm. ed.) 349, § 6560, the *Proper* case was cited with approval, the author, concerning that case, saying:

"To arrive at conclusions from physical facts alone, however, is often dangerous. It has been said to be rarely, if ever, safe to attempt to judge the rate of speed merely from a consideration of the amount of physical damage done."

The above text states a sound rule and is certainly applicable to the facts in the case at bar.

At the close of the case, the trial court orally announced that judgment would be entered in respondent's favor, the court, however, assigning a basis for the judgment other than that later embodied in the finding of fact. After stating the theory upon which the court based its ruling in respondent's favor, the court continued:

"I believe the cars were probably driving in excess of fifteen miles an hour. I don't know that absolutely, but

from the damage that was done it might easily be that they were driving that. People don't always stick to those strict rules when they are driving. MR. LAWWILL: Is the court making a finding as to the vehicles on the highway and as to the question of lights? THE COURT: No, I don't. I don't feel it is necessary for the court to find them. I feel it was really Mrs. Rosing's mission. . . ."

While of course the trial court had a perfect right to change its position concerning the formal findings to be entered, the court's statement quoted from the oral summation indicates that at the close of the trial the court was not at all certain as to the rate of speed of appellant's car, and that, in forming an opinion concerning such rate of speed, the court was influenced only by the evidence concerning the damage to the two vehicles.

The court's finding above quoted clearly indicates that the finding of excessive speed was based solely upon the nature and extent of the damages to the two cars which collided. Examination of the statement of facts discloses no evidence concerning the speed of appellant's car other than that above referred to. While the condition of automobiles after a collision may properly be considered in estimating the speed of one or more of the cars involved in an accident, we are convinced that the evidence concerning the condition of the two cars in question does not support the court's finding that appellant's car was moving at a speed greater than fifteen miles per hour.

The finding is contrary to all the direct evidence as to the speed of appellant's car. Evidence such as that upon which the trial court based its finding is, at best, in its nature speculative and uncertain, and unless unusually convincing (which the evidence in the case at bar is not) should not be held to outweigh uncontradicted testimony of witnesses who spoke from actual knowledge. The witnesses who testified to the speed of appellant's car were nowise discredited, and two of them, Mr. and Mrs. Chabot, appear to have been entirely disinterested.

Since the matter of the supposed speed of appellant's car was the only negligence on the part of appellant found

by the trial court, the finding upon which the judgment was based is not supported by the evidence.

Our conclusion upon this phase of the case renders it unnecessary to discuss any other of appellant's assignments of error which bear upon appellant's appeal from the judgment entered by the trial court.

In regard to appellant's contention that the trial court erred in not awarding her judgment against respondent, the court found that the allegations of appellant's crosscomplaint were not supported by the evidence. On questions presented by the cross-complaint, the evidence is in conflict, and the ruling of the trial court upon this phase of the case should be affirmed.

The judgment appealed from is reversed, with instructions to enter judgment dismissing both respondent's action and appellant's cross-complaint.

SIMPSON, C. J., ROBINSON, BLAKE, and MALLERY, JJ. concur.