[No. 32278. Department Two. June 4, 1953.]

ELSIE S. ADKISSON, as *Administratrix, et al., Appellants,*
v. THE CITY OF SEATTLE *et al., Respondents.*[1]

[1]Reported in 258 P. (2d) 461.

*Kennett, McCutcheon & Soderland* and *Vernon Gould,* for appellants.

*A. C. Van Soelen, Arthur Schramm, Gordon H. Sweany, Carl P. Zapp, Elliott, Lee & Thomas,* and *McWalters & Copass,* for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment of dismissal in a wrongful death case, after a verdict of the jury in favor of the defendants.

Roxbury Homes, Inc., applied to the city of Seattle for permission to make improvements on certain streets by constructing sewers and water mains, together with the necessary appurtenances. Permission was so granted in ordinance No. 79057. The ordinance provided that all work should be performed under direct supervision of the city engineer, and should be done in accordance with the "Standard Plans and Specifications of the City of Seattle."

Section 1-34 of the Standard Plans, under the designation, "GENERAL STIPULATIONS APPLICABLE TO ALL CONTRACTS," provides:

"The contractor shall not obstruct travel unnecessarily and shall cause as little inconvenience as possible to occupants of abutting property and to the general public."

Section 1-35 provides:

"The contractor shall erect and maintain good and sufficient guards, barricades, signals, and standard 'Street

Closed' and 'Detour' signs at all unsafe places on the work, . . ."

Later, Roxbury Homes, as owner, contracted in writing with Glendale Construction Service, Inc., as contractor, to perform this work.

October 7, 1950, at about eleven o'clock a. m., the contractors commenced to dig a trench on west Roxbury street between Thirty-first avenue southwest and Thirty-second avenue southwest, and completed the work between three-thirty p. m. and four-thirty p. m. the same day.

West Roxbury street is an arterial running in an easterly and westerly direction. It is thirty-six feet wide from curb to curb, consisting of an eighteen foot blacktop strip on the north and an eighteen foot concrete strip on the south. However, at the location in question, no curbs were in, and the blacktop was approximately fifteen feet wide. The concrete strip on the south was originally a county road. The city constructed its portion a few years ago. The line between the concrete and the blacktop constitutes the county and city limits. Although it is considered as a three-lane highway, the general practice is for cars traveling easterly to use the concrete portion of the pavement and those traveling westerly to use the blacktop portion. There is a downgrade on west Roxbury from Twentieth avenue southwest westerly to Twenty-eighth avenue southwest (at one point the grade is 9.2%) and an upgrade from there to Thirty-first avenue southwest, where the grade is 6.7%.

The north side of the trench was about eighteen inches from the north edge of the blacktop. It (the trench) was thirty inches wide and fifty-two inches deep. The dirt was placed on the south side of the trench toward the center of the road, covering the blacktop.

As stated before, the work was completed between three-thirty and four-thirty p. m. That night, shortly after midnight, Adkisson and Wagner left the Trucker's Club in White Center. Soon thereafter, while driving in a westerly direction on west Roxbury, they drove straight into and onto the pile of dirt, scraping a foot of dirt off the top for a

distance of thirty-two feet. The automobile then "turned and flipped in mid-air," traveled a distance of fourteen feet, and came into contact with an eastbound automobile on the concrete portion of the street. The impact sheared the body of their automobile from the chassis. The chassis then traveled an additional ten to twelve feet. Both men were instantly killed.

We quote paragraph III B of the first cause of action of the amended complaint, as to plaintiff Adkisson.

"That the defendants, and each of them, created the above mentioned dangerous situation and maintained the above mentioned public nuisance with full knowledge that the same was an unusual hazard and a condition of great danger to travelers using said public highway and with full knowledge that travelers upon said public highway were likely to be injured or killed thereby. That defendants, and each of them, at said time and place, had the ability to avoid the said dangerous situation and public nuisance and the danger to travelers upon said public highway by piling said dirt off the roadway in the first instance, or, having deposited the dirt as they did, by closing the said highway to traffic and erecting and maintaining standard 'Street Closed' and 'Detour' signs, or by erecting and maintaining good, sufficient and adequate lights, danger signals, warnings, guards and barricades to warn travelers upon said public highway of said dangerous condition and public nuisance. That defendants, and each of them, failed to use any of the means alleged in the next preceding sentence to protect travelers at said time upon said highway. That defendants, and each of them, were then and there callous and indifferent to the fact that injury was likely to result to travelers upon said highway and each of them was then and there guilty of wanton misconduct."

There was a similar allegation in the second cause of action as to plaintiff McCutcheon. There were also third and fourth causes of action alleging, in the alternative, that the facts alleged constituted negligence. The defendants alleged affirmatively that the acts of the decedents constituted wanton misconduct, or, in the alternative, contributory negligence.

At the close of the plaintiffs' case, the trial court dismissed the counts charging wanton misconduct, and the

trial then continued on the issue of negligence and contributory negligence. The jury, in answer to special interrogatories, found the defendants negligent, but that such negligence was not a proximate cause of the deaths of Adkisson and Wagner. The jury also found that Adkisson was negligent and that his negligence was the sole proximate cause of his and Wagner's deaths.

Appellants' assignments of error are that the trial court erred:

1. In sustaining respondents' challenges to the sufficiency of the evidence on wanton misconduct at the close of appellants' case.

2. In reason No. 5 in the order denying motion for a new trial in finding that there was not sufficient evidence of wanton misconduct and public nuisance to take those issues to the jury.

3. In refusing to give plaintiffs' requested instructions Nos. 10 and 11.

4. In refusing to give plaintiffs' requested instructions Nos. 26 and 27.

5. In submitting the issue of speed to the jury and giving instructions Nos. 11 and 14 thereon.

6. In reason No. 4 in the order denying motion for new trial in finding that there was sufficient evidence of speed to take that issue to the jury.

7. In refusing to give plaintiffs' requested instruction No. 29.

8. In giving instruction No. 14 allowing the jury to consider, on the issue of speed, items on which there was not sufficient evidence.

9. In giving instruction No. 11, that the applicable speed limit was twenty-five miles per hour.

10. In giving instructions Nos. 3, 10, 18, and 24, incorrectly stating the law on proximate cause.

11. In refusing to give plaintiffs' requested instruction No. 12.

12. In refusing to withdraw or correct erroneous instruction No. 19.

13. In reason No. 6 in the order denying motion for a new trial in holding that the error in instruction No. 19 was invited by appellants and that the request to withdraw the same was not timely.

14. In refusing to give plaintiffs' requested instructions Nos. 20, 23, and 24.

15. In refusing to give plaintiffs' requested instruction No. 17.

16. In reason No. 3 in the order denying motion for a new trial in holding that the errors made during the trial and in the instructions were rendered immaterial by the jury's answers to the special interrogatories.

17. In denying appellants' motion for a new trial and in entering judgment of dismissal.

Appellants group together assignments of error Nos. 1, 2, 3 and 4, involving the issues of public nuisance and wanton misconduct.

■ In an ordinary tort action, the defendant is liable if his negligence was a proximate cause of the plaintiff's injury, provided there was no negligence on the part of the plaintiff which contributed to his own injury. The early English case of *Butterfield v. Forrester*, 11 East 60, involved an accident wherein a pole had been placed across a highway. The plaintiff, while riding violently, ran into the pole and was injured. The jury found for the defendant. In refusing a new trial, Lord Ellenborough, C. J., laid down the rule of law:

"One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff."

■ ■ Wilful or wanton misconduct is not, properly speaking, within the meaning of the term "negligence." Negligence and wilfulness imply radically different mental states. Negligence conveys the idea of neglect or inadvertence, as distinguished from premeditation or formed intention. An act into which knowledge of danger and wilfulness enter is not negligence of any degree, but is wilful misconduct. As long as the element of inadvertence remains in conduct, it is not properly regarded as wilful. Wanton misconduct is positive in nature, while mere negligence is materially negative. A person properly chargeable with wanton misconduct is not simply one who is more careless than one who is merely negligent. Wanton mis-

conduct is such as puts the actor in the class with the wilful doer of wrong. 38 Am. Jur. 692, Negligence, § 48.

■ Since neither wilful nor wanton misconduct arises out of negligence, the contributory negligence of the plaintiff is no defense to an action based on the defendant's wilful or wanton misconduct. Whether or not such conduct is wilful or wanton, is a question of fact for the jury. No court has questioned the soundness of this proposition, so far as injuries inflicted by wilful misconduct are concerned. However, with regard to wanton misconduct, some discernment must be exercised by the courts, or the defense of contributory negligence will be barred by the artifice of describing the conduct of the defendant as wanton. The South Dakota court, in *Carlson v. Johnke*, 57 S. D. 544, 234 N. W. 25, 72 A. L. R. 1352, held that the doctrine of contributory negligence had no application where the defendant was guilty of wanton misconduct. However, three years later, in *Wittstruck v. Lee*, 62 S. D. 290, 252 N. W. 874, 92 A. L. R. 1361, the court receded from that position and held that mere wanton and reckless conduct, falling short of intentional tort on the part of the defendant, would not render plaintiff's contributory negligence immaterial. We do not care to go that far. If the defendant's conduct is actually wanton, rather than negligent, the plaintiff's contributory negligence should not preclude recovery.

■ On the other hand, wanton misconduct on the part of the plaintiff, as distinguished from negligence which contributes to the injury, will prevent recovery therefor, notwithstanding the wanton misconduct of the defendant. 38 Am. Jur. 856, Negligence, § 178, Annotation, 41 A. L. R. 1379, and cases cited therein. The rule is stated in Restatement, Torts, 1299, § 503 (2):

"An actor whose conduct is in reckless disregard of his own safety is barred from recovery against a defendant whose reckless disregard of the actor's safety is a contributing cause of the actor's bodily harm.

"*Comment*:

"*a.* The fact that an actor's misconduct is in reckless disregard of his own safety rather than merely negligent with

respect to his safety is important in an action against a defendant whose conduct in reckless disregard of the actor's safety is a legal cause of the actor's harm. In such a case, the actor is not barred from a recovery by reason of his own negligence which legally contributes to cause his harm although he is barred from a recovery if his conduct is in reckless disregard of his own safety."

■ There is a distinction between "wilful" and "wanton" misconduct, although the two words are used interchangeably by many text writers and courts. The distinction is thus stated in 38 Am. Jur. 693, Negligence, § 48:

"To constitute wilful misconduct, there must be actual knowledge, or that which the law deems to be the equivalent of actual knowledge, of the peril to be apprehended, coupled with a conscious failure to avert injury. A wanton act is one which is performed intentionally with a reckless indifference to injurious consequences probable to result therefrom. Wanton misconduct is such as manifests a disposition to perversity, and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of such surrounding circumstances and existing conditions, that his conduct will in all common probability result in injury. Strictly speaking, wilful misconduct is characterized by intent to injure, while wantonness implies indifference as to whether an act will injure another. Graphically expressed, the difference between wilfulness and wantonness is that between casting a missile with intent to strike another and casting a missile with reason to believe that it will strike another, but with indifference as to whether it does or does not."

Wanton misconduct has been defined as: reckless disregard of what may be the probable consequences of an act calculated to cause injury, *Lacey v. Louisville & N. R. Co.*, 152 Fed. 134; the party doing the act or failing to act must be conscious of his conduct, and, without having the intent to injure, is conscious from his knowledge of existing conditions and circumstances that injury will likely or probably result from his conduct, and, with a reckless disregard of consequences, does some act or omits some duty that results in injury, *Central of Georgia R. Co. v. Graham*, 220 Ala. 645, 127 So. 213; a heedless and reckless disregard for

another's rights, with the consciousness that the act or omission to act may result in injury to that other; *Hazle v. Southern Pac. Co.*, 173 Fed. 431; a wrongful act done on purpose or in malicious disregard of the rights of others. *Evans v. Illinois Central R. Co.*, 289 Mo. 493, 233 S. W. 397. See Annotation 151 A. L. R. 9.

Defining wantonness, the court said, in *Birmingham Southern R. Co. v. Powell*, 136 Ala. 232, 33 So. 875:

"The jury would have been authorized to infer from the acts and conduct of the defendant's agents a reckless indifference to probable consequences of harm and injury to others, and that such acts were performed with a knowledge of facts and conditions, that rendered the same greatly dangerous to the lives of others, and a probability that they would result injuriously. This degree of recklessness, with a conscious knowledge of its probable harmful consequences, constitutes that wantonness, which in law finds its equivalent in point of responsibility, to willful or intentional wrong."

The rule is stated in Restatement, Torts, 1293 *et seq.*, § 500:

"The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him.

"*Comment*:

"*a*. In order that the actor's conduct may be in reckless disregard of the bodily security of others, it must not only involve a high degree of probability that death or serious bodily harm will result therefrom, but the circumstances must be such that the risk so created is unreasonable.

"*b*. Conduct cannot be in reckless disregard of the safety of others unless the act or breach of duty is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable man to realize the extreme risk to which it subjects the safety of others. It is reckless for a driver of an automobile intentionally to cross a through highway in defiance of a stop sign if a stream of vehicles

is seen to be closely approaching in both directions, but if his failure to stop is due to the fact that he has permitted his attention to be diverted so that he does not know that he is approaching the crossing, he may be merely negligent and not reckless. . . .

"*c.* In order that the actor's conduct may be reckless, it is not necessary that he himself recognize it as being extremely dangerous. His inability to realize the danger may be due to his own reckless temperament or to the abnormally favorable results of previous conduct of the same sort. It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct. . . .

"*e.* The mere fact that certain precautions are required by a statute rather than the common law does not of itself make the intentional omission of the statutory precaution, reckless indifference to the safety of others. In order that the breach of such statute shall constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result. . . . "

"*g.* Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind."

 Wanton misconduct is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another.

In view of the fact that the trial court dismissed the counts alleging wanton misconduct at the close of the plaintiffs' case, we shall consider only the plaintiffs' testimony in order to determine whether or not there was sufficient testimony to submit that issue to the jury. No witness for the plaintiffs testified that he saw any red lanterns. All witnesses testified that there were no warning signs placed at the east end of the obstruction, such as "Detour," "Slow," etc. The dirt pile was estimated at from three to six feet high. Several witnesses testified that there were three flare pots, one at the east end, one at the west end, and one in the middle. One witness testified that there was only one flare pot light on the entire pile. The effect of the lights varied from "a reddish flickering light" to "yellowish" and "whitish yellow." One witness said that he did not see any lights as he came down the hill from the west. Most witnesses testified that visibility was poor.

No portion of the blacktop lane of the street between Thirty-first avenue southwest and Thirty-second avenue southwest was open to travel. As a result, automobiles going east on the concrete lane would travel straight ahead, but automobiles going west on the blacktop would have to swerve to the left onto the concrete when they came to the obstruction. It was testified that the barricade at the east end of the pile was "a regular carpenter's sawhorse." Quite a number testified that west Roxbury was the most heavily traveled arterial in that area. Several witnesses testified that, as they traveled westerly, they were not aware of the obstruction until they suddenly came upon it; that it was then necessary to swerve sharply to the left to get onto the

concrete. One witness testified that it was necessary for him to back up in order to make the turn. He said that he was compelled to apply the brakes hard, and that he skidded to keep from hitting the dirt pile. There is very little testimony as to the speed of these cars, although a couple of the drivers said they were traveling between twenty and twenty-five miles per hour.

Let us now consider the evidence in the light of the rule we have announced. It is clear that if the defendants had dug the trench, placed the dirt where they did, and had not placed any signs, barriers, or lights at all, these acts would have constituted wanton misconduct. But where is the line to be drawn? The failure to erect and maintain sufficient guards, barricades, signals, and standard "Street Closed" and "Detour" signs would not, of itself, constitute wanton misconduct, but such failure could be considered, together with the surrounding circumstances and conditions.

When we consider, from plaintiffs' testimony, that west Roxbury was the most heavily traveled arterial in that area; that westbound traffic proceeded over the blacktop; that there was a long downgrade in approaching the obstruction from the east; that the north lane of the road between Thirty-first southwest and Thirty-second southwest was completely obstructed to travelers going westerly; and that, during the very evening after the work was completed, several drivers, headed westward, narrowly escaped running into the obstruction and were required to swerve to the left onto the concrete, we feel that whether or not the conduct of the defendants was wanton was a question of fact to be submitted to the jury under proper instructions.

The trial court erred in sustaining the challenge to the sufficiency of the evidence, and in dismissing the counts alleging wanton misconduct at the close of the plaintiffs' case.

Assignments of error Nos. 5, 6, 7, and 8, on the issue of the speed of the Adkisson car, can be considered together. It is appellants' contention that the issue of speed should not have been submitted to the jury, since there was no direct testimony as to the speed of the car, and that allow-

ing the jury to draw a conclusion from the physical evidence alone is to allow it to base an inference upon an inference. Appellants rely strongly on certain language found in a number of cases which they cite.

In *Burge v. Anderson*, 164 Wash. 509, 3 P. (2d) 131, we said: "We have frequently and consistently held it to be error to submit to the jury a question where there was no substantial testimony upon which to base the instruction." This statement has been quoted with approval in a large number of subsequent cases.

In *Huber v. Rosing*, 22 Wn. (2d) 110, 154 P. (2d) 609, the trial court disregarded the oral testimony as to speed and based its findings as to defendant's negligence solely upon the extent and nature of the damage suffered by the cars as the result of the collision. In reversing a judgment for the plaintiff, we said:

"In the case of *Proper v. Brenner*, 191 Wash. 540, 71 P. (2d) 389, we said:

" 'It is often dangerous to arrive at conclusions from mere physical facts. It is, for example, rarely, if ever, safe to attempt to judge the rate of speed from a consideration of the amount of physical damage done; but there are situations where physical facts are controlling.'

"In the case cited it was held that the absence of tire marks on the soft shoulder of a highway immediately after an accident proved that the injured pedestrian had been struck on the hard surface of the highway.

"In 10 Blashfield, Cyclopedia of Automobile Law & Practice (Perm. ed.) 349, § 6560, the *Proper* case was cited with approval, the author, concerning that case, saying:

" 'To arrive at conclusions from physical facts alone, however, is often dangerous. It has been said to be rarely, if ever, safe to attempt to judge the rate of speed merely from a consideration of the amount of physical damage done.'

"The above text states a sound rule and is certainly applicable to the facts in the case at bar. . . .

"The finding is contrary to all the direct evidence as to the speed of appellant's car. Evidence such as that upon which the trial court based its finding is, at best, in its nature speculative and uncertain, and unless unusually convincing (which the evidence in the case at bar is not)

should not be held to outweigh uncontradicted testimony of witnesses who spoke from actual knowledge."

In *Hauswirth v. Pom-Arleau*, 11 Wn. (2d) 354, 119 P. (2d) 674, we said:

"The nature of an impact and the violence of a collision, together with its results, may be taken into consideration in connection with all the other circumstances in determining the rate of speed of a colliding vehicle." [Citing cases.]

See, also, *Hardman v. Younkers*, 15 Wn. (2d) 483, 131 P. (2d) 177, 151 A. L. R. 868.

In *Graham v. Roderick*, 32 Wn. (2d) 427, 202 P. (2d) 253, 6 A. L. R. (2d) 1237, an action tried to the court, we said:

"Appellant's own estimate of his speed was thirty to thirty-five miles per hour. The trial court made a finding, however, that appellant's speed was in excess of thirty-five miles per hour, considering the distances to, and the force with, which the respective automobiles were hurled, and having in mind the damage to the respective vehicles. This the court was entitled to find."

In *Day v. Polley*, 147 Wash. 419, 266 Pac. 169, we said:

"Appellants assert that respondent did not, nor did anyone else in his behalf, testify to the rate of speed at which appellants' car was driven. It is therefore asserted that the testimony of the driver, Polley, that he was driving at a moderate speed, about twenty-five miles per hour, stands uncontradicted. The jury were not bound to believe the testimony of Polley, an interested witness, even though uncontradicted. But there is positive evidence by respondent's wife that she saw the lights of the car, evidently that of appellants', about half a block away, west on Fourth avenue, and that it seemed impossible for that car to strike them unless it was going about one hundred miles an hour. Moreover, the testimony of respondent, which must be considered as true since the jury so considered it, was that he saw the car of appellants about that same distance away, that he was three-fourths of the way across the intersection when struck, and the evidence as to how far his car was hurled by the impact is very persuasive evidence of the rate of speed of the car by which his car was struck. And again, these facts were for the jury."

*Christensen v. Grays Harbor County*, 34 Wn. (2d) 878, 210 P. (2d) 693, was an action against the county for dam-

ages arising out of an automobile accident. The Christensens testified that they were traveling between forty and forty-five miles an hour, when suddenly the right front wheel struck a chuck hole in the road, the jolt slamming the steering wheel out of Mr. Christensen's hand. The car traveled approximately three hundred feet down the road, crossed it, and turned over, coming to rest on its top and against a tree. No one witnessed the accident. The jury rendered a verdict in favor of the defendant. Appellants contended that the court erred in submitting the following instruction:

" 'You are instructed that in determining the speed of the automobile driven by the plaintiff, Thomas E. Christensen, immediately prior to and at the time of the accident complained of, you will consider along with the oral testimony with reference thereto all of the testimony of the physical conditions at the time and place of the accident.' "

In holding that the showing of the physical facts called for a decision by the jury, we said:

"But, in making its decision, the jury was not obliged to believe the testimony of the plaintiffs Christensen as to their speed, even though uncontradicted, but was entitled to take into consideration all of the circumstances surrounding the accident."

Trial courts should be hesitant in submitting to the jury the question of the rate of speed merely from a consideration of the physical facts alone. Nevertheless, we know from experience that interested witnesses are very apt to color their testimony as to speed because of their interest in the outçomė. We also know that the testimony of disinterested witnesses varies to such an extent regarding speed that their testimony is of little value to the trier of facts. If the trial judge, in the exercise of his discretion, feels that the jury could arrive at a decision (as distinguished from a mere guess or speculation) as to the rate of speed by a consideration of the physical facts, such as the amount of physical damage done, the distance a car travels after the impact, etc., then he should submit such issue to the jury.

In the case at bar, no one saw the Adkisson car before it reached the obstruction. One witness testified that he saw it on the dirt pile, but was unable to estimate its speed at that time. However, there was testimony that the dirt pile was from three to six feet high; that the Adkisson car ran directly into and onto the pile of dirt, scraping a foot off of the pile for a distance of thirty-two feet; that it then "turned and flipped in mid-air," traveled a distance of fourteen feet and came into contact with an eastbound automobile on the concrete portion of the street; that the impact sheared the body of the automobile from the chassis; that the chassis then traveled an additional ten to twelve feet; that the body of the car was practically demolished and that both passengers were instantly killed. We are of the opinion that, on that evidence, the trial court properly submitted the question of speed to the jury.

Assignment of error No. 9 is that the court erred in giving instruction No. 11:

". . . it shall be unlawful for the operator of any vehicle to operate the same at a speed in excess of the following:

"(1) Twenty-five miles per hour within the limits of incorporated cities and towns; . . ."

Appellants contend that it was error to submit the quoted portion of instruction No. 11, inasmuch as the city of Seattle, under RCW 46.48.040, had the right to increase the maximum speed allowable on its streets and, therefore, the statute limiting the speed to twenty-five miles per hour is inapplicable. Appellants urge that it was the duty of respondents to show that the speed limit of twenty-five miles per hour was in fact the limit at that time in Seattle.

No authority has been furnished to support this ingenious argument. If, in fact, the city had, by ordinance, increased the speed limit, it was incumbent upon appellants to establish such fact by competent proof and, in addition, to establish that the city had posted signs at either end of such portion of the street, setting forth the maximum speed allowed, as provided in RCW 46.48.044. See *Seattle v. Strang,*

169 Wash. 686, 14 P. (2d) 1112; *Huber v. Hemrich Brewing Co.*, 188 Wash. 235, 62 P. (2d) 451.

We quote the first paragraph of instruction No. 3, and all of instructions Nos. 10 and 18. No exception was taken to the giving of instruction No. 24, and it will not be considered by us.

"No. 3. The plaintiffs are not entitled to recover merely because there was an accident, but must prove by a fair preponderance of the evidence that the defendants were negligent in one or more particulars as charged in the complaint, that Ralph Eugene Adkisson and Frederick F. Wagner were killed, and that the defendants' negligence was the proximate cause of such deaths and resultant damages to plaintiffs."

"No. 10. If you find from the evidence and under these instructions that defendants were negligent in one or more particulars as alleged in plaintiffs' complaint, and that such negligence was the sole proximate cause of the deaths of Adkisson and Wagner, then your verdict should be for both plaintiffs.

"If you find from the evidence and under these instructions that the defendants were negligent, and you further find that the deceased Adkisson was guilty of contributory negligence, and that their negligence concurred to cause the accident, then your verdict should be in favor of only McCutcheon as administrator of the Wagner estate, and should be in favor of the defendants in the action brought for Adkisson's death.

"If you find that defendants were not negligent, or if you find that they were negligent but that their negligence was not the proximate cause of the accident, and that the negligence of Adkisson was the sole proximate cause of the accident, then your verdict should be for the defendants."

"No. 18. During the trial, counsel for the respective parties stipulated in open court that the car in which Adkisson and Wagner were riding at the time of their death was being operated by Adkisson.

"The negligence, if any, of the operator of an automobile cannot be imputed to a passenger under the law of this State.

"Therefore, you are instructed as a matter of law that the negligence of Adkisson, if any, cannot be imputed to the decedent Wagner, and under the evidence in this case you cannot find Wagner guilty of contributory negligence.

"If you find that the defendants or any of them were guilty of negligence, and that such negligence was the proximate cause of the death of Wagner, then your verdict must be in favor of the plaintiff McCutcheon in the Wagner action. This is true even though you should find Adkisson guilty of contributory negligence.

"You are further instructed that under the pleadings and evidence in this case you are not entitled to find that the deaths of Adkisson and Wagner were the result of unavoidable accident."

Appellants urge that the use of the terms "the proximate cause" and "the sole proximate cause" were prejudicial to them, and that the instructions should only have contained the term "a proximate cause." In a given case, the negligence of one individual may be a proximate cause, the proximate cause, and the sole proximate cause. That would be where there was only one act of negligence, and that by one of the parties. If the negligence of two or more defendants concurs to cause the damage, the negligence of each defendant individually would be *a* proximate cause, but not *the* proximate cause, nor *the sole* proximate cause. The negligence of the defendant might concur with the contributory negligence of the plaintiff. In that situation, although the negligence of either would be *a* proximate cause, the concurring negligence of both would be *the* proximate cause.

We have an additional situation here, where the negligence of the defendants and of the driver Adkisson could concur and result in the deaths of both Adkisson and Wagner. Such concurring negligence would be the proximate cause of the deaths of both men. In that event, Adkisson's administratrix could not recover because his negligence contributed to his own death. Wagner's administrator could recover, because Adkisson's neligence could not be imputed to Wagner. If the defendants and Adkisson were negligent, but Adkisson's negligence did not concur with that of the defendants to cause the deaths, and the negligence of the defendants was the sole proximate cause of the deaths, then the representatives of both men could recover from the defendants. If the defendants and Adkisson were neg-

ligent, but the defendants' negligence did not concur with that of Adkisson to cause the deaths, and the negligence of Adkisson was the sole proximate cause of the deaths, then the representatives of neither Adkisson nor Wagner could recover from the defendants, because defendants' negligence was not a proximate cause of the accident.

 Instruction No. 3 was erroneous, as to Wagner's administrator, wherein it was stated: "The plaintiffs . . . must prove . . . that the defendants' negligence was the proximate cause of such deaths." But we do not believe that the jury was misled by such language when we read the instructions as a whole. The jury was told that Adkisson's negligence could not be imputed to Wagner. Instruction No. 10 set up a pattern to guide the jury and we do not see how the language complained of in instruction No. 3 could have been prejudicial to Wagner's administrator. This is especially true in view of the interrogatories. Instruction No. 24 explained the interrogatories and was not excepted to.

Error is assigned in the refusal to withdraw or correct instruction No. 19.

"No. 19. In this case the Court has permitted the introduction of photographs taken on October 9, 1950. These photographs were admitted solely for the purpose of showing the general area in question.
"You are instructed that you are not to consider these photographs in determining the question of whether or not at the time of the collision and death there were such barricades and warning lights, signs, etc., such as required by law, in place at the east end of the dirt pile."

This instruction was proposed by the plaintiffs, along with the other instructions, when they rested their case. Later, in rebuttal, other photographs were admitted without any limitations whatsoever. Counsel for plaintiffs excepted to the giving of instruction 19 and asked that it be withdrawn except as to one photograph introduced in their case in chief. The court instructed the jury between one-thirty and two-thirty in the afternoon. Arguments consumed the rest of the afternoon and into the following af-

ternoon. Then, for the first time, after the jury had retired to deliberate, counsel raised the question by his exception to the instruction. The trial court denied the request, stating that, under the circumstances, the request was not timely, and furthermore, that, because of the complexities of the issues involved, it would be very dangerous to recall the jury and reframe the instruction.

The trial lasted about two and one-half weeks. Many complex issues were involved. It was the duty of the trial judge to decide, in the exercise of his discretion, whether or not this instruction was of sufficient importance to require the recall of the jury to change it. The refusal to change or withdraw the instruction, under the particular circumstances hereinbefore related, did not constitute error.

The trial court did not err in refusing to give appellants' proposed instructions for which error is assigned.

The judgment of dismissal, as to the issue of negligence, is affirmed. It is reversed as to the issue of wanton misconduct, and the cause is remanded with direction to grant a new trial on that issue alone.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.

---

August 21, 1953. Petition for rehearing denied.