**Prince COVINGTON, individually and as personal representative of the Estate of Deceased Minor Child Joshua Covington, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civil No. 94–00330 ACK.**

United States District Court, D. Hawai'i.

Jan. 16, 1996.

Michael Jay Green, David J. Gierlach, Honolulu, HI, for plaintiff.

Theodore G. Meeker, United States Attorneys Office, Honolulu, HI, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAY, Chief Judge.

This action arises out of a tragic incident— the drowning of 11–year old Joshua Covington, son of plaintiff Prince Covington, who at the time was a Staff Sergeant in the United States Marine Corps. The drowning occurred at the military portion of Bellows Air Force Base beach ("Bellows"), Oahu, Hawaii on Easter Sunday, April 19, 1992. The matter came on for bench trial on November 28, 1995.

The Court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The following facts essentially are undisputed by the parties:

1. Both parties agree that jurisdiction and venue are proper in this court.

2. Both parties have stipulated to the admission of all exhibits into evidence, which have been designated plaintiff's exhibits 1 through 58.

3. On Easter Sunday April 19, 1992, at approximately 10:00 a.m., Joshua Covington, the 11 year old son of plaintiff Prince Covington, accompanying his friend Dennis Warren, Jr. (also 11 years old) and Dennis Jr.'s father, Staff Sergeant Dennis Warren, Sr., arrived at picnic area number 5 at the military portion of Bellows Air Force Base Beach for a family outing that had been organized by SSgt. Warren for military personnel just returned from Operation Desert Storm and their families. Linda Warren arrived at Bellows later that day.

4. The portion of the beach in question is closed to the general public but open to the military and its guests without charge.

5. At the time, plaintiff Prince Covington was a Staff Sergeant in the United States Marine Corps, residing as a single parent

with his son Joshua at Kaneohe Marine Corps Air Station, Hawaii.

6. On the day in question, Prince Covington was at work, filling in for a colleague, and therefore did not accompany Joshua and the Warrens to the beach, although Joshua went with his permission.

7. The Warrens and Joshua arrived at Bellows around 10:00 a.m. to set up and planned on serving food at around 4:00 p.m. SSgt. Warren had reserved picnic area number 5 for the outing. He picked picnic area number 5 partially because it was close to lifeguard tower 4 and also because there were areas for various activities such as softball and horseshoes.

8. Initially, Joshua and Dennis Jr. helped SSgt. Warren set up the picnic area. At some time during the day, Joshua and Dennis Jr. were given permission by SSgt. Warren to go into the water. They did so in the vicinity of Tower 4, which was somewhat to the left of the picnic area.

9. At around 3:00 p.m., Joshua, Dennis Jr. and other children were playing in the water in the vicinity of Tower 4. The water in that area was relatively calm and around two to three feet deep, with waves breaking at around 1 to 2 feet. Dennis Jr., Joshua and other children were playing a game with a small football whereby the one in the middle tries to get the ball being thrown back and forth by the others.

10. At around 3:30 p.m., a somewhat larger wave came upon the group of children, including Joshua. Several children, including Joshua, who had his back to the wave, were knocked down. Dennis Jr. saw Joshua (who was seaward of Dennis Jr.) knocked down by the wave but did not see him resurface. After looking and waiting for a short period of time for Joshua to resurface, Dennis Jr. ran in from the ocean.

11. At some point thereafter, lifeguards David Keliihananui, Andrea Borges and Jackie Macy–Haith were notified of a missing child and/or a possible drowning.

12. Searches for Joshua were begun at various times by both individual lifeguards on duty and private citizens, as well as the base shore patrol which was called to the scene.

13. At approximately 4:15 p.m., as the beach was being cleared, Joshua's body was found in approximately 18 inches of water, approximately 10 yards in front of Tower 4, and approximately 5 yards from where he went under.

14. Joshua was pulled from the water, and the paramedics attempted to clear the water from his lungs. He then was placed in an ambulance and taken to Castle Medical Center, where he was pronounced dead at 5:06 p.m. after resuscitative efforts failed.

15. The window of opportunity to save Joshua was from 3 to 5 minutes before death or severe brain damage.

The remaining facts are disputed in some fashion by the parties. The Court will deal first with the facts surrounding the drowning itself and then with the condition of the beach—including the training, posting and equipping of lifeguards, warning signs, and other conditions as they relate to plaintiff's claims. Based upon the witnesses' demeanor and credibility, and other evidence, the Court finds as follows:

### A. Facts Surrounding Drowning Itself

#### i. Staff Sergeant Dennis Warren, Sr.

16. SSgt. Warren remained at the picnic area up until the time of the incident, preparing food and participating in the day's events. The event was a family type gathering.

17. SSgt. Warren testified that there was no liquor of any sort served at the gathering.

18. However, on May 2, 1992, two weeks after the incident, the Warrens were interviewed by a military investigating officer investigating the incident. See Exhibit 24 (investigative interview report). The Court finds that because this report was given shortly after the incident, it overall more accurately reflects the actual events of the day as compared with the Warrens' recollection at trial.

19. The report states that according to SSgt. Warren, soda and beer were being served at the picnic area. The Court also notes Exhibit 26, an investigator's memo of investigator Matthew Williams, which states

that according to SSgt. Slauzis, a base security police officer who responded to the incident, alcohol was being consumed by many of the adults at the party. The Court finds that alcohol was served at the party.

20. SSgt. Warren testified that he gave Dennis Jr. and Joshua permission to enter the water at around 2:30 p.m., after his wife Linda Warren arrived. He testified he specifically waited until she arrived before allowing the boys in the water.

21. The report however states that according to SSgt. Warren, Dennis Jr. and Joshua were in the water from about 10:30 a.m. In addition, the report states that according to Dennis Jr., of the approximately five and a half hours from the time they arrived to the drowning, he and Joshua spent between three and a half and four and a half hours in the water. The Court finds that Dennis Jr. and Joshua had been in and out of the water prior to 2:30 p.m.

22. SSgt. Warren testified he would not have allowed the boys to go into the water if he had felt the lifeguard tower was inadequately manned or that there would not be a proper response to a water emergency.

23. Just prior to Joshua being hit by the wave and going under, Dennis Jr., Joshua and the other children were playing in the vicinity of several adults, including Sgts. Briggs and Owens.

24. SSgt. Warren first became aware of a problem when Dennis Jr. ran up to him while he (SSgt. Warren) was turning meat on a grill. Dennis Jr. told him that Joshua had been knocked down in the water by a wave and was missing.

25. SSgt. Warren then told his wife Linda of the incident, told her to call 911, and went to the water to look for Joshua. He was in the water about a minute and a half. During that time, he observed Sgts. Briggs and Owens also searching for Joshua.

26. After coming out of the water, SSgt. Warren went up to Tower 4, where he encountered lifeguard Jackie Macy, who was crying and talking with someone.

27. SSgt. Warren testified he told her that Joshua was missing and pointed to the area where he thought Joshua had gone down. Macy responded to the effect: "Are you sure he isn't playing around somewhere?"

28. SSgt. Warren testified that Macy did nothing and that, in his observation, nothing more of substance was done until the shore patrol arrived and cleared the water, at which time Joshua's body was found.

29. SSgt. Warren testified that Dennis Jr. told him that when he (Dennis Jr.) first came out of the water after Joshua had gone under, he went to Tower 4, told Macy that his friend was drowning, and Macy replied to the effect: "Get out of my face, I'm eating."

### ii. *Linda Warren*

30. At the time of the incident, Linda Warren was on the beach near where the children were playing in the water. At some point, she saw Dennis Jr. run out of the water past her. A short while later, SSgt. Warren came back with Dennis Jr., told her of the incident and told her to call 911, which she did from a pay phone in front of the recreation center.

31. Linda Warren testified she then went back to Tower 4. By this time, her son had told her of the statement allegedly made by Macy telling him to get out of her face because she was eating. Linda Warren testified she began berating Macy, at which point Macy began to cry.

32. The report however states that according to Linda Warren, after she called 911 from the pay phone, she waited there until the ambulance arrived. According to the report, Linda Warren never mentioned going to a lifeguard tower or talking with a lifeguard. The Court finds that while Linda Warren may have spoken with a lifeguard at some point in time after calling 911, when, to whom, and what words were exchanged is unclear.

### iii. *Dennis Warren, Jr.*

33. Dennis Jr. testified there were no adults in the water with him when the wave hit.

34. The report however states that according to Dennis Jr., there were adults in the water, and they helped some of the chil-

dren out of the water after the large wave hit. The Court finds that several adults, including Sgts. Briggs and Owens, were near Dennis Jr. and Joshua when the wave hit and that they helped up some of the children who had been knocked down.

35. Dennis Jr. testified he looked around briefly for Joshua, and when he could not find him, ran out of the water to Tower 4 where he encountered Macy and told her his friend was drowning. Dennis Jr. testified that Macy told him in effect: "Get out of my face, I'm eating."

36. The report however states that according to Dennis Jr., he only looked towards Tower 4 initially, and seeing no lifeguard, ran back to the pavilion to tell his father what had happened. The Court finds that while Dennis Jr. may have gone to Tower 4 at some point after the incident, he first ran to his father.

37. With respect to Macy's alleged remark, the report contains no mention by the Warrens of any such remark by Macy. At trial, Macy denied making such a remark. It is difficult for the Court to understand why, if Macy in fact made such a remark, no mention of it was made in the report. The Court finds that while words may have been exchanged at some point between the Warrens and Macy, it is not the case that Dennis Jr. ran out of the water straight to her, told her his friend was drowning, and she responded by telling him to get out of her face because she was eating.

38. At some point, Dennis Jr. ran up to a building on the beach, next to which was a surfboard. There, he encountered a man and told him of the situation. The man responded by running into the water with his surfboard, apparently to search for Joshua.

#### iv. *Jackie Macy*

39. Jackie Macy acted as "beach patrol" or "rover" on the day in question. As such, it was her duty to relieve the lifeguards at the towers for their breaks and to relieve the person on duty at the boathouse.

40. Macy was in the vicinity of Tower 4 when she saw a crowd of people and observed David Keliihananui, the lifeguard assigned to that tower, run down the beach towards the water.

41. Macy testified she went to the crowd but could not find out what was happening, and when Keliihananui came back out of the water, he too seemed unable to tell her what was happening. Macy also testified that when Borges came up to her, she could not understand what Borges was saying. Macy also testified she did not remember anyone specifically telling her that a child was drowning or missing in the water, although at some point she did come to know that a child was missing.

42. Macy testified she went back up to the tower to scan the water with binoculars to see if she could spot anything. Though the presence of binoculars at the towers is disputed, according to Exhibit 24, SSgt. Warren reported that as he approached Tower 4 the second time, Macy was in the tower looking through binoculars. In addition, Thomas Haines, the boyfriend of Andrea Borges (the lifeguard at Tower 2) states in his sworn statement (Exhibit 7) that after Borges left Tower 2 to respond to the drowning, he used binoculars at that tower to observe what was happening and observed Jackie Macy in Tower 4 looking at the water with binoculars. The Court finds that binoculars were present in Towers 2 and 4 at the time of the drowning. The Court finds also that Macy reported this incident over the phone to the boathouse, although it is unclear whether she said a child was drowning or simply missing.

43. The Court finds that Macy's overall reaction to the incident was indecisive and largely ineffective. She failed to obtain complete information about the incident as it was developing, she did not take direct action herself to try to locate Joshua (she never went into the water), and she failed to direct others (lifeguards and people on the beach) to take effective action. Macy testified it is possible she simply panicked during the incident and in the face of the commotion from the crowd. The Court finds that Macy did indeed panic. However, the Court finds also (as discussed below) that she was adequately trained and that her panicking therefore was not foreseeable. As a result, the Court finds

that Macy's failure to take effective action was not wilful or malicious.

### v. *Andrea Borges and Thomas Haines*

44. Andrea Borges was the lifeguard assigned to Tower 2 on the day in question. Thomas Haines was her boyfriend at the time of the incident and is now her husband. Borges and Haines were at Tower 2 at the time of the incident.

45. Borges first realized there was a problem at Tower 4 when a young boy ran up to her tower and told her that he needed help because his friend was drowning.

46. Borges responded by running after the child and signalling with her hand to her head to her then boyfriend Thomas Haines to call the boathouse.

47. When Borges arrived at Tower 4, she first went to one of two groups of people and asked what was going on. She was told a child was missing in the water and was asked why there was not a lifeguard.

48. Borges looked up at Tower 4 and saw Macy sitting on a step of the tower. At the same time, Borges saw Keliihananui out in the water on a rescue surfboard paddling around.

49. Borges then went to where Macy was and asked what was happening. Macy told her she did not know. Borges responded by asking why no one had told her (Borges) about this incident and why a little boy had to run to Tower 2 to tell her.

50. Borges testified that when she told Macy a child had been reported drowning and asked her what they were going to do, Macy responded to the effect: "We're doing nothing. Just go back to your tower, you're not needed here."

51. At this point, Shore Patrolman Sgt. Manny Thornton arrived, asked what was going on, related that an ambulance was coming on base, and asked why the SPs had not been notified.

52. Borges testified that Macy responded to Thornton by saying that she did not know what was going on, that Keliihananui was not saying anything, that she was waiting for someone from the crowd to tell her what was going on, and that all she knew was that a boy was missing.

53. Borges then went back to one of the crowds of people and asked one of the shore patrolman if she should begin a sweep. He told her to ask Macy.

54. Borges testified Macy responded to the effect: "You can do it if you want to. There's probably no missing kid. It's probably a big joke."

55. Borges obtained such information as she could from individuals in the crowd as to where they thought the child had gone down and then began a sweep with herself and two or three members of the crowd. They held hands and walked through the water parallel to the shore in the area where they thought Joshua had been reported missing.

56. The sweep was unproductive, partly because they were further out than where Joshua was and partly because the waves kept making them lose their balance. Additionally, when the body was found, it appeared that the sweep had been conducted further out than where the child actually was.

57. After her sweep, Borges was told by the shore patrol to begin clearing the water of people in order to facilitate a further search. As she was completing this task, Joshua's body was found in approximately 18 inches of water, approximately 10 yards in front of Tower 4, and approximately 5 yards from where he went under.

58. The water at the time and place that Joshua disappeared was turbid and cloudy, and visibility under water was restricted to a few feet at the most.

### vi. *David Keliihananui*

59. David Keliihananui was the lifeguard stationed at Tower 4 on the day of the incident. However, he considered his duties also to include covering Tower 5. As a result, during the day, he sometimes would walk the beach between Towers 4 and 5. However, at the time Joshua went under, Keliihananui was in or next to Tower 4.

60. At some point after Joshua went under, a white male approached Keliihananui and told him a child was missing.

61. Keliihananui tried to find out from people on the beach where the child was and what the child looked like but he was unable to obtain accurate information.

62. Keliihananui went approximately 75 to 100 yards down the beach looking for the child and pulled out of the water an 8 or 9 year old black child who he said was panicking in the water. Keliihananui then went back to Tower 4. As he went back, people on the beach told him that a child was missing in the water. However, they were unable to tell him exactly where.

63. When Keliihananui got back to Tower 4, Macy was there. He told her that a child was reported missing in the water. He then took a rescue board into the water and began paddling around looking for the child. His search was unsuccessful.

64. Prior to the incident, Keliihananui had seen several black children playing in the surf by Tower 4 but did not perceive them to be in any difficulty or danger. He felt the water conditions were safe. He did not see the wave that knocked down Joshua.

## B. Staffing of Lifeguards; Signs; Beach Conditions; and Training and Equipping of Lifeguards

### i. Staffing of Lifeguards and Beach Conditions

65. On the day in question, there were three lifeguards on duty at Bellows beach. One was Andrea Borges, who was assigned to Tower 2. Another was David Keliihananui, who was assigned to Tower 4 but who also took it upon himself to cover Tower 5. The third was Jackie Macy, who was assigned as "beach patrol" or "rover." Macy's job, among other things, was to relieve Borges and Keliihananui when they went on break.

66. On the day in question, there were five lifeguard towers, Towers 1 through 5, on the military side of Bellows beach, which is approximately one mile long. The distance between Towers 2 and 4 was about 800 yards.

67. On the day in question, Towers 2 and 4 were manned. Towers 1, 3 and 5 were unmanned. The unmanned towers (1, 3 and 5) bore wooden signs stating: "BEACH CLOSED TO SWIMMERS—NO LIFEGUARD ON DUTY."

68. The towers were distributed along Bellows beach such that, facing inland, Tower 1 was closest to the boathouse towards the right side and Tower 5 was closest to the left side, which was also closest to the base fence line and the civilian portion of the beach. Towers 2 through 4 were in between Towers 1 and 5, in sequential order. Since the time of the incident, the towers have been renumbered and possibly relocated.

69. To the left (facing inland) of Tower 5 is a rock jetty jutting out into the ocean. A stream flows out of the jetty into the ocean. At Tower 3, there is a seawall and very little beach. There is no evidence that the United States built the jetty or seawall or that it maintains them. There also is no evidence that the jetty or seawall increases the natural danger of the ocean nearby those structures or elsewhere.

70. On the day in question, Christine Velilla was the outdoor recreation director at Bellows. Velilla was a certified lifeguard, although her certification had lapsed. She was not trained in beach lifeguarding. Velilla officially was the "lifeguard supervisor." However, she believed she had delegated lifeguard supervisor responsibilities to Macy; although Macy did not consider herself to be a lifeguard supervisor or to have been supervising Borges and Keliihananui on the day in question. Yet Macy was the one who signed off on the other lifeguards' beach training logs. See Exhibit 16. In addition, Aaron Hu, who was stationed at the boathouse on the day in question, referred to Macy as lifeguard supervisor. See Exhibit 6. The Court thus finds that in certain respects, Macy acted in a supervisory role over Borges and Keliihananui.

71. On the day in question, Towers 1, 3 and 5 were not manned because, according to Velilla, she did not have sufficient personnel to cover all five towers.

72. Because of government budget cuts, Velilla was authorized a total of only five lifeguard positions for the winter months (April was considered a winter month) and

six for the summer. Velilla attempted to get authorization for more lifeguard positions but was unsuccessful. Because she had to staff the towers 7 days a week and to give the lifeguards some time off, two tower lifeguards plus one rover was all she could manage on April 19, 1992.

73. Exhibit 30, Air Force Operating Instruction 215–2, specifies that on weekends and holidays, there are to be 9 lifeguards on duty. This instruction (without the handwritten corrections) was in effect on April 19, 1992. Velilla had handwritten modifications to this instruction in light of the reduction in staff (for example, changing 9 lifeguards on weekends and holidays to 6) but her modifications had not yet been formally approved.

74. Exhibit 41, an excerpt from a Commander's Audit Report of 1986 for Bellows, references an HQ PACAF safety policy letter which requires "a minimum of two qualified lifeguards on duty at beaches, with one additional lifeguard for every 75 swimmers." Exhibit 41 states also that "as many as 15 to 19 lifeguards were required to ensure safety during peak beach activity." The staffing at Bellows on the day in question did not meet the standards in Exhibits 30 or 41.

75. The Court however finds that the failure to post lifeguards at Towers 1, 3 and 5 did not significantly increase the danger with respect to the water in front of Tower 4, where Joshua drowned. At the time Joshua went under, there were two lifeguards, Kelihananui and Macy, in the vicinity of Tower 4. It is undisputed that two lifeguards in the vicinity of Tower 4 was an adequate number. The Court therefore finds that the failure to man Towers 1, 3 and 5 did not proximately cause (or was not a substantial factor in causing) Joshua's death and, more generally, that inadequate staffing of lifeguards did not proximately cause (or was not a substantial factor in causing) Joshua's death.

### ii. *Posting of Signs and Beach Conditions*

76. As discussed previously, the unmanned towers (1, 3 and 5) bore wooden signs stating: "BEACH CLOSED TO SWIMMERS—NO LIFEGUARD ON DUTY." In addition, there was also a sign at the picnic area stating as follows (Exhibit 39):

### BELLOWS BEACH RULES

#### Meaning of Flags

[Red]   Swimming Prohibited

[White]   Safe to Swim

[Yellow]   Beware of Portuguese Man-o-war

1. Use the buddy system while swimming or diving.
2. Obey lifeguards.
3. Ensure adults are with children under 12.
4. Don't bring bottles, frisbees, or pets on beach.
5. Don't fish in swimming areas.
6. Don't use surf or sand sliding boards.
7. Don't play ball at the beach.

#### Stay Alive.

#### Swimming & Drinking—Do Not Mix!

77. Plaintiff's water safety expert Douglas D'Arnall testified that Bellows had inadequate signs and that there should have been signs warning of high surf, lateral currents and backwash. As discussed below in the Court's conclusions of law, however, the United States had no duty to post such signs warning of the natural dangers of the ocean.

78. As compared with a beach like Sandy Beach in Oahu, Bellows is a relatively safe beach. Moreover, on the day in question, all of the lifeguards had agreed to set out white flags indicating that it was safe to swim in the ocean. Even though there was testimony that the surf picked up in the afternoon in front of Tower 4, the Court finds that the lifeguards did not improperly continue displaying the white "safe to swim" flag up until the time of the incident. At the time of the incident, the water conditions were such that the lifeguards were justified in not shutting down the beach and preventing swimming.

79. Bellows beach does not have an extensive history of injuries and drownings. There was testimony that there may have been one previous drowning at Bellows

beach. This drowning apparently took place at night, and the victim apparently had been drinking. Keliihananui also testified that he had performed some rescues in the past but none of these were major incidents.

80. In contrast, plaintiff's water safety expert D'Arnall testified that Huntington Beach in California (which is three and a half miles long) had two to three thousand rescues per year, including 2 to 3 drownings per year.

### iii. *Training and Equipping of Lifeguards*

81. Plaintiff contends that the lifeguards at Bellows on the day in question were inadequately trained and equipped and that this inadequate training and equipping caused Joshua's death.

82. Borges, Keliihananui and Macy each were certified by the American Red Cross. While not dispositive, this is the minimum requirement specified by Air Force Regulation 215-49 dated November 1, 1990 (Exhibit 29).

83. In addition, a few weeks before the day of the incident, all three lifeguards had attended and completed a week long Water Safety Instructor certification course offered by the American Red Cross. This is the preferred certification pursuant to ¶ 9-4(a) of Exhibit 29.

84. In addition, the lifeguards conducted their own beach training approximately once a week. Such training included running, swimming, surfboard rescue, backboard use, rescue tube use and lifesaving water techniques. *See, e.g.,* Exhibit 16 (record of training for Keliihananui signed off by Macy).

85. Given the foregoing, the Court finds that Borges, Keliihananui and Macy were adequately trained as lifeguards. The Court finds further that inadequate training of lifeguards did not cause Joshua's death.

86. Plaintiff also contends that the lack of adequate safety equipment at the lifeguard towers caused Joshua's death.

87. In light of testimony that Macy used binoculars at Tower 4 and that Thomas Haines used binoculars at Tower 2, the Court finds that there were binoculars at Towers 2

and 4, whether or not the binoculars were the lifeguards' own or were issued by the boathouse to the tower.

88. Furthermore, the Court finds that even assuming there were no binoculars at Tower 4, the fact that Joshua went under less than 10 yards from Tower 4, immediately disappeared beneath the water, and was not seen again until his body was recovered compels the conclusion that any absence of binoculars was not a substantial factor in causing Joshua's death.

89. Plaintiff also contends the lack of whistles, operating megaphones and dive masks at the towers caused Joshua's death.

90. The scene at Tower 4 immediately after the incident was confused. It was difficult for the lifeguards to determine from people in the crowd exactly where Joshua went under. Moreover, the adults near Joshua when he went under were unable to find him even though they began looking for him right after he disappeared.

91. The Court finds that while whistles and/or operating megaphones might have made it easier to some extent for the lifeguards at Tower 4 to communicate with people on the beach and in the water, any lack thereof was not a substantial factor in causing Joshua's death.

92. The Court finds that the inability to locate Joshua resulted primarily from a combination of the sudden nature of his disappearance, his failure to resurface thereafter, the murkiness of the water, and the difficulty in determining from the crowd exactly where Joshua went under.

93. The Court also finds that the fact that Macy panicked in the face of the commotion from the crowd that gathered around her after Joshua went under was a contributing, though not substantial, factor in the failure to rescue Joshua.

94. Finally, the Court finds that a diving mask would not have made a significant difference in the search for Joshua, since the water was murky and visibility was very limited.

95. The Court finds that the responses of the lifeguards to the report of a missing or

drowning child were not optimal. They could have attempted more forcefully and effectively to ascertain from the crowd where Joshua went under. Macy could have entered the water to assist Keliihananui, and Borges could have done so sooner. The lifeguards also could have immediately cleared some or all of the people from the water and enlisted others to help with a sweep. They could have shouted despite the lack of whistles or working megaphones. They did contact the boathouse as early as possible. However, Macy's panicking clearly was counterproductive.

96. Yet, as explained below, even if the Court found that the lifeguards were negligent (which the Court does not find), and even if the Court found that this negligence was a substantial factor in causing Joshua's death (which the Court also does not find), plaintiff still would be unable to recover under the Hawaii Recreational Use Statute.

97. Any finding of fact more properly deemed, in whole or in part, a conclusion of law shall be deemed as such, and vice versa. All findings of fact by the Court are based upon a preponderance of the evidence.

### CONCLUSIONS OF LAW

1. The Federal Tort Claims Act ("FTCA") waives the United States' sovereign immunity with respect to injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2671 *et seq.; see also Richards v. United States,* 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492 (1962); *Proud v. United States,* 723 F.2d 705, 706 (9th Cir.1984) (United States liable " 'in the same manner and to the same extent as a private individual under like circumstances;' " citing 28 U.S.C. § 2674); *see also* 28 U.S.C. § 2680 (exceptions to waiver).

2. In Hawaii, there are no common law distinctions between classes of persons on another's land. The standard of care of the landowner is to use reasonable care for the safety of all persons reasonably anticipated to be on the premises, regardless of legal status. *Gibo v. City & County of Honolulu,* 51 Haw. 299, 301, 459 P.2d 198 (1969); *Pickard v. City & County of Honolulu,* 51 Haw. 134, 135–36, 452 P.2d 445 (1969). The general standard of care in Hawaii is that which a reasonably prudent person would have done or would not have done under the circumstances. *Fujioka v. Kam,* 55 Haw. 7, 10, 514 P.2d 568 (1973).

3. Hawaii however has in place a Recreational Use Statute ("HRUS") (H.R.S. § 520–1 *et seq.*) which accords private land owners substantial immunity from actions in tort by those who come onto their land for recreational purposes.[1] Relevant provisions follow:

4. H.R.S. § 520–1 provides:

The purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.

5. H.R.S. § 520–3 provides:

Except as specifically recognized by or provided in section 520–6, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

6. H.R.S. § 520–4 provides:

Except as specifically recognized by or provided in section 520–6, an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:

(1) Extend any assurance that the premises are safe for any purpose.

---

1. The parties agree that the HRUS applies to this case. The HRUS applies to government property closed to the general public. *See Stout v. United States,* 696 F.Supp. 538, 539 (D.Haw.1987).

(2) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

(3) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission or commission of such persons.

■ 7. The HRUS thus abolishes liability for negligence on the part of private land owners who allow persons onto their property for recreational purposes. *See Palmer v. United States*, 945 F.2d 1134, 1137 (9th Cir. 1991) ("Application of the HRUS precludes ... theories of liability based upon mere negligence."). Moreover, a land owner who takes affirmative steps to safeguard those who come onto his or her property for recreational purposes does not thereby voluntarily undertake a duty of reasonable care. *Id.* To hold otherwise might discourage efforts to make recreational facilities safer. *Id.*

8. The limitation of liability under the HRUS is not however absolute. H.R.S. § 520–5(1) provides in part:

Nothing in this chapter limits in any way any liability which otherwise exists:

(1) For wilful or malicious failure to guard or warn against a dangerous condition, use, or structure which the owner knowingly creates or perpetuates....[2]

■ 9. H.R.S. § 520–5 thus imposes upon the United States a duty to refrain from (1) "wilful or malicious failure to guard or warn against" (2) "a dangerous condition, use, or structure which [it] knowingly creates or perpetuates."[3] There are thus two hurdles for the plaintiff to overcome.

■ 10. With respect to the first hurdle—"wilfulness"—the Intermediate Court of Appeals of Hawaii has defined "wilful" as "premeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences; unlawful; without legal justification." *Marshall v. University of Hawaii*, 9 Haw.App. 21, 36, 821 P.2d 937 (1991) (citing Black's Law Dictionary 1434 (5th ed. 1979)). Hawaii courts have not directly defined "wilful" as it is used in the HRUS. Since the recreational use statute is in derogation of the common law rules of tort liability, it should be construed strictly so as to "avoid an overbroad interpretation ... that would afford immunity that was not intended." *Ducey v. United States*, 713 F.2d 504, 510 (9th Cir.1983).

11. Other jurisdictions with recreational use statutes exempting wilful and malicious behavior have defined "wilful." California's definition is fairly representative. *See Termini v. United States*, 963 F.2d 1264, 1267 (9th Cir.1992) (applying California's recreational use statute); *see also Bell v. Alpha Tau Omega Fraternity*, 642 P.2d 161, 162 (Nev.1981) (applying Nevada's recreational

**2.** The HRUS also provides for liability where the land owner has charged a fee for use of the land, or where the injured person was a houseguest. H.R.S. § 520–5. Plaintiff does not contend that either of these exceptions is applicable. Clearly, Joshua was not a houseguest. Moreover, although the Warrens paid to use the picnic area behind the beach, this fee does not trigger the charge exception because it was not a prerequisite to Joshua's entry onto the beach. *See Viess v. Sea Enterprises Corp.*, 634 F.Supp. 226, 229 (D.Haw.1986) ("[T]he Hawaii statute ... speaks only to the explicitly *quid pro quo* arrangement whereby a landowner conditions admission to the land upon payment of a fee."). *Id.*

**3.** Plaintiff suggests that the United States may be liable for having violated its own regulations regarding proper staffing and equipping of lifeguards. Under the FTCA, however, the United States' own policies and procedures may not create an independent duty to follow such policies and procedures where state law recognizes no comparable private liability. *See Zabala Clemente v. United States*, 567 F.2d 1140, 1148–

49 (1st Cir.1978) (Under the FTCA, "[j]ust as the government cannot invoke sovereignty as a defense to distinguish its conduct from that of private persons, plaintiffs cannot use the implicit sovereignty of the government to argue that all its internal communications establish standards of care similar to those created by duly promulgated laws of general application."); *cf. Chainey v. Jensen*, 1 Haw.App. 94, 96, 614 P.2d 402 (1980) ("[A] violation of a statutory duty [is] only evidence of negligence [and not negligence *per se*].").

Here, the Court finds that the policies, procedures and rules assertedly violated by the United States in staffing and equipping lifeguards at Bellows beach were "internal communications" that did not establish standards of care similar to duly promulgated laws of general application. Accordingly, while the United States may not be held liable *per se* for failing to follow its policies, procedures and rules, they may be relevant to show notice of probable danger.

use statute); *Jones v. United States,* 693 F.2d 1299, 1304 (9th Cir.1982) (applying Washington's recreational use statute); *Miller v. United States,* 945 F.2d 1464, 1467 (9th Cir.1991) (applying Arizona's recreational use statute).

■ 12. California courts have set out three essential elements that must be present before a negligent act becomes wilful misconduct:

(1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril.

*See, e.g., Termini,* 963 F.2d at 1267; *see also Hannon v. United States,* 801 F.Supp. 323, 328 (E.D.Calif.1992) (willful and malicious conduct is not presumed, plaintiff has burden to specify the particular acts constituting that conduct).

13. With respect to the second hurdle in § 520–5—the presence of a "dangerous condition, use, or structure which the owner knowingly creates or perpetuates"—this District has held that § 520–5 imposes no duty to warn of the *"per se* dangerous natural conditions always existing in ocean waters." *Viess v. Sea Enterprises Corp.,* 634 F.Supp. 226, 230 (D.Haw.1986). *Viess* rejected cases from other jurisdictions holding land owners liable for failing to warn of dangerous natural conditions because the recreational use statutes of those states did not contain Hawaii's limiting language: "which the owner knowingly creates or perpetuates." *Id.*

14. Thus, according to *Viess,* even a *wilful or malicious* failure to guard or warn against a dangerous natural condition is not actionable under § 520–5 since a natural danger is not one which the land owner "knowingly creates or perpetuates." *See id.* at 231 ("The 'willfulness' exception of Chapter 520 is not intended to include the mere failure to warn of the *per se* dangerous natural conditions always existing in ocean waters."); *compare Termini v. United States,* 963 F.2d 1264, 1267–69 (9th Cir.1992) (United States Forest Service's failure to warn of road *it built* leading to a cliff actionable under California's RUS); *Rost v. United States,* 803 F.2d 448, 452 (9th Cir.1986) (United States Forest Service's failure to warn of extending piece of steel road gate *it built* actionable under California RUS).

15. Here, there was no evidence presented that the man-made jetty or seawall made the ocean conditions at Bellows more dangerous than natural.

16. The Court agrees with the holding in *Viess.* Hence here, even assuming the United States knew that Bellows beach was dangerous and wilfully and maliciously failed to guard or warn against that danger by doing absolutely nothing, there would be no liability under § 520–5 on the part of the United States.

17. The question then becomes, if the United States would not be subject to liability under § 520–5 for even a wilful or malicious failure to guard or warn had it done *absolutely nothing* to safeguard or warn against dangers at Bellows beach—that is, if the United States had left Bellows beach in its natural state—then is it possible for the United States somehow to become subject to liability as a result of the steps it took to try to safeguard Bellows beach on the day in question?

■ 18. Plaintiff contends yes. Plaintiff's theory is that the second hurdle of § 520–5 is satisfied because the United States knowingly created a dangerous condition—that is, a "facade of safety"—by placing too few, inadequately equipped and trained, lifeguards at Bellows on the day in question and by failing to warn that (1) staffing was inadequate; (2) the lifeguards were inadequately trained; and (3) the lifeguards lacked certain safety equipment.

19. Plaintiff then contends that the first hurdle of § 520–5 is satisfied because the United States wilfully and maliciously failed to give these warnings.

20. The Court however finds that plaintiff has failed to surmount either hurdle under § 520–5.

21. With respect to the second hurdle, in its order filed May 16, 1995 granting in part and denying in part the United States' motion for summary judgment, the Court

agreed with plaintiff that a false appearance of safety, created by the placement of inadequate and/or untrained and/or inadequately equipped lifeguards on the beach, might result in a *more* dangerous condition than the natural danger of the ocean. *Cf. Fochtman v. Honolulu Police and Fire Departments,* 65 Haw. 180, 649 P.2d 1114 (1982) (" 'If there is no duty to come to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which makes his situation worse;' " citing Prosser, *Handbook of the Law of Torts* § 56 (4th ed. 1971)); *Kaczmarczyk v. City and County of Honolulu,* 65 Haw. 612, 617, 656 P.2d 89 (1982) ("even where a municipality is under no duty to provide lifeguard services, yet if it voluntarily assumes this protective responsibility, it has a duty to perform those services with reasonable care") (no discussion of HRUS despite its enactment some years earlier). In that order, the Court stated: "[T]he government may be held liable to the extent that it created, and wilfully or maliciously failed to guard or warn against, this danger. The Court notes that such liability offends neither the HRUS nor the Ninth Circuit's holding in *Palmer* because it does not provide for liability based merely on negligence. *See* H.R.S. § 520; *Palmer,* 945 F.2d at 1137." Order, filed May 16, 1995, at 13.

22. For example, assume that on April 19, 1992 at Bellows beach, the United States had provided as "lifeguards" three individuals with absolutely no training as lifeguards (indeed, assume these three individuals cannot even swim). Also assume that the United States (that is, the official who authorized the posting of these individuals as lifeguards) knew that the individuals could not swim. Nevertheless, the individuals were assigned to be lifeguards at Bellows, assigned to lifeguard towers, given lifeguard t-shirts to wear to identify them as lifeguards, and equipped as lifeguards.

23. In this hypothetical situation, the United States might have *knowingly created* a dangerous condition, because the beach *with* the purported lifeguards might be a *more* dangerous condition than the beach in its natural state—with no lifeguards or warnings or any safety measures at all. The

reason such a posting of "lifeguards" might have increased the danger level to a level above the natural danger level of Bellows beach is because beachgoers rely to a certain extent on the presence of lifeguards.

24. If one assumes that in a drowning incident the "lifeguards" who cannot swim will be completely ineffective, the people's reliance on the purported "lifeguards" might have increased the overall danger level *above* the natural danger level of the untouched beach. In other words, an untouched beach is dangerous to a certain extent because of natural ocean conditions. Staffing the same beach with lifeguards who cannot swim might make the beach even *more* dangerous because people rely to a certain extent on the presence of lifeguards.

25. Normally, a beach is rendered safer (in comparison with its natural untouched state) by the presence of lifeguards. Normally, the additional protection provided by the lifeguards more than offsets any decrease in caution on the part of the beachgoers caused by their reliance on the lifeguards. It would appear to the Court that only under extremely unusual circumstances might providing lifeguards actually *increase* the danger level of the beach above the natural danger level. One such circumstance might be the hypothetical discussed above—"lifeguards" who look like lifeguards but who cannot swim.

26. The relevant inquiries thus reduce to the following: (1) Given the staffing, training and equipping of Borges, Keliihananui and Macy on Bellows beach on April 19, 1992, was Bellows beach thereby rendered *more dangerous* than it would be for swimmers in its natural untouched state; *and* (2) did the United States *know* that its actions had rendered Bellows beach more dangerous for swimmers?

27. The Court finds that both questions must be answered in the negative. The first question must be answered in the negative since the Court already has found that the training of the lifeguards was adequate—including Red Cross certification; a one week Water Safety Instructor course a few weeks prior to April 19, 1992; and ongoing weekly beach and water lifesaving training

conducted by the lifeguards themselves. Whether or not they had whistles or megaphones or other safety equipment does not affect this conclusion.

28. Accordingly, the second question also must be answered in the negative since the United States' knowledge is therefore irrelevant.

29. Thus, at the outset, the Court finds that plaintiff has failed to satisfy the second hurdle under § 520–5. Accordingly, even if the Court found that plaintiff satisfied the first hurdle—that is, the United States wilfully and maliciously failed to warn that Bellows beach was dangerous—plaintiff would be unable to recover.

■ 30. Nevertheless, the Court does find that under the three prong test of wilfulness discussed above, plaintiff has failed to prove wilfulness. First, the Court finds that the United States may have had actual or constructive knowledge "of the peril to be apprehended," based on testimony by the various lifeguards and by Velilla that they complained on numerous occasions that lifeguard staffing and equipping was inadequate. On the other hand, the effect of any such "knowledge" was mitigated to a large extent by the fact that Velilla compensated for inadequate staffing by closing Towers 1, 3 and 5. The Court thus finds that plaintiff fails to establish element one.

31. Second, the Court finds that the United States did not have actual or constructive knowledge that injury was probable as opposed to merely possible. The Court discounts testimony by various lifeguards that they believed injury was "probable" because the word "probable" is simply too vague.[4] The Court finds that in order for "probable" to have any meaning apart from "possible" in this context, "probable" must mean that there is a significant likelihood that injury will occur. One definition in this context might be that there was a greater than 50% chance that someone would be injured at Bellows beach on April 19, 1992.

32. The Court already has found that Bellows on the day in question, at the time in question, properly was designated by the lifeguards with a white "Safe to Swim" flag. The water was relatively shallow and the surf relatively calm. Children were playing in the waves with no noticeable danger. Finally, Bellows beach has no significant record of drownings and/or injuries (there might have been one prior drowning). Accordingly, and without defining "probable" with any numerical precision, the Court finds that the United States had no knowledge that injury was "probable" as opposed to "possible" at Bellows beach on April 19, 1992.

33. Finally, the Court finds that the United States did not consciously fail to act "to avoid the peril" because inasmuch as conditions were safe, there was no peril under element two.

34. Thus, the Court finds that plaintiff may not recover because he also has failed to prove "wilfulness," the first hurdle in § 520–5.

■ 35. Finally, the Court finds that plaintiff has failed to prove causation. The Court already has found that Keliihananui and Macy were in the vicinity of Tower 4 (Keliihananui was in or next to it) when Joshua went under. Even plaintiff's expert D'Arnall did not dispute that two lifeguards in the vicinity of Tower 4 was adequate in number. While Macy appears to have panicked, Keliihananui attempted to ascertain where Joshua went under and went out into the water to look for him. There also were adults in the area where Joshua went under who tried to look for Joshua but could not find him. Fins, masks and snorkels would not have made a difference given the murky water. Even without whistles and megaphones, the lifeguards could have shouted to clear the water and seek information. The cause of Joshua's death was the wave that knocked him down. The Court thus finds that plaintiff has failed to prove that inadequate staffing, training and/or equipping of lifeguards caused Joshua's death.

**4.** *Webster's Ninth New Collegiate Dictionary* (1986) defines "probable" as "1: supported by evidence strong enough to establish presumption but not proof ... 2: establishing a probability ... 3: likely to be or become true or real."

36. In closing, the Court notes with sadness and sympathy the pain and suffering of plaintiff Prince Covington. His testimony at trial was heartfelt and moving. It is clear he is a fine father who lost a precious son in Joshua, through a tragic accident and through no fault of his own or Joshua. Nonetheless, the law and the facts of this case compel the Court's result.

37. The Court ORDERS that judgment be entered in favor of defendant United States.

IT IS SO ORDERED.