Ida I. JONES and Lisa A. Jones, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

v.

NATIONAL PARK CONCESSIONS, INC.; Joseph B. Barlow; and Bainbridge Bible Chapel, Third Party Defendants and Additional Defendants.

No. 81–3567.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1982.

Decided Dec. 7, 1982.

Daniel F. Sullivan, Seattle, Wash., argued for plaintiffs-appellants; Tom Golden, Seattle, Wash., on brief.

Susan Barnes, Asst. U.S. Atty., Seattle, Wash., for defendant-appellee.

Before WRIGHT and SKOPIL, Circuit Judges and JAMESON,* District Judge.

JAMESON, District Judge:

Ida I. Jones and Lisa A. Jones appeal from a judgment in favor of the United States in this suit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* We affirm.

## I. *Factual Background*

Lisa, then 15 years of age, was severely injured in an accident on April 16, 1977, on a slope at Hurricane Ridge in Olympic National Park in the State of Washington.[1] She was on an outing sponsored by her church, the Bainbridge Bible Chapel, under the supervision of Joseph B. Barlow. Lisa and her friend, Beverly Thornberry, each rented an inner tube from National Park Concessions, Inc. (NPC)[2] for a dollar to use for snow sliding. Initially they tubed with others in a "Snow Play Area", designated by a directional sign at the Park lodge.[3] Eventually, however, they moved to the slope where the accident occurred.[4] Beverly went down the slope first, mounted on her inner tube stomach down, and rolled off the tube at a level area near the bottom of the slope. Lisa, seated on her tube, was unable to stop, crossed the level area at a high rate of speed, and crashed into a tree, fracturing her spine, shoulder and several ribs.

## II. *District Court Proceedings*

Lisa's mother, Ida I. Jones, individually and as guardian for Lisa, brought suit under the Federal Tort Claims Act. NPC, Bainbridge Bible Chapel, and Barlow were later added as defendants.[5] The district

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. The Park is operated by the National Park Service, Department of the Interior. Improvements made by or with the permission of the Government include a lodge, parking areas, roads, hiking and cross-country ski trails, and down-hill skiing areas.

2. National Park Concessions, Inc. holds a concession contract for the operation of the lodge. Its rights are limited to the lodge building and a 6–12 foot strip surrounding the lodge.

3. A snow play area is designated by a directional arrow immediately in front of the lodge. A large map inside the lodge shows the

ridge, snow play area, and downhill slopes. The park has a policy not to use negative signing. That is, it uses a positive signing approach, like that used by ski areas. Signs are placed designating appropriate use, but no negative signs except emergency signs are used.

4. The slope was a bowl or cirque created by earlier glacier activity. It looked very steep from one angle and not so steep from another. There appeared to be a level area or bench at the bottom.

5. They were named as third-party defendants in the Government's answer and later included as additional defendants in plaintiff's amended complaint.

court granted the Government's motion for partial summary judgment, holding the Government's liability was controlled and limited by the Washington Recreational Land Use Act, RCW 4.24.210, which requires proof that the Government's conduct was willful and wanton.

Plaintiff settled with Barlow before trial [6] and NPC during trial,[7] both by way of a covenant not to execute. The jury returned a verdict against Bainbridge Bible Chapel, but found Lisa was 60% comparatively negligent.[8] The trial judge found that the plaintiff had failed to establish willful and wanton conduct on the part of the Government as required by the Washington Recreational Land Use Act and entered judgment for the Government.[9]

### III. *Issues on Appeal*

Two issues are presented on this appeal: (1) whether the liability of the United States is controlled by the Washington Recreational Land Use Act; and (2) if so, whether the conduct of the United States was willful or wanton.

### IV. *Washington Recreational Land Use Act*

■ Under the Federal Tort Claims Act the Government is liable for negligent acts and omissions of its employees, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Since the accident occurred on government land in Washington, Washington tort law is applicable, *Rayonier Inc. v. United States,* 352 U.S. 315, 318, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957). In granting partial summary judgment, the district

court concluded that the land in question was subject to the Washington Recreational Land Use Act.

RCW 4.24.210 (as it read at the time of Lisa's injury) provided in pertinent part:

Any public or private landowners or others in lawful possession and control of agricultural or forest lands . . . and rural lands adjacent to such areas . . . who allow members of the public to use them for the purpose of outdoor recreation, . . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users; *Provided,* That nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted: *Provided further,* That nothing in RCW 4.24.200 and 4.24.210 limits or expands in any way the doctrine of attractive nuisance.

The purpose of the Act is stated in RCW 4.24.200:

The purpose of RCW 4.24.200 and 4.24.-210 is to encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon.

Appellants contend that the district court erred in holding (1) that the Government was a "recreational landowner" entitled to assert the immunities of the Washington Recreational Land Use Act; (2) that Olym-

---

**6.** Plaintiff settled with Barlow for $50,000—$25,000 for Lisa and $25,000 for Ida.

**7.** Plaintiff settled with NPC for $200,000—$195,000 for Lisa and $5,000 for Ida.

**8.** The jury found that Lisa had sustained damages totaling $851,000. Deducting $220,000 already paid by Barlow and NPC left a balance of $631,000. The court ordered judgment against Bainbridge Bible Chapel for 40% of that amount—$252,400. The jury found that Ida

had sustained damages in the amount of $25,-000; but she had already received $30,000 in settlement, so was deemed fully compensated.

**9.** The court stated that if the test "were only that of negligence" it "would find the United States was negligent and its negligence was a proximate cause of the accident." It would "under the comparative negligence standards of Washington also have found the plaintiff at least 50% contributorily negligent."

pic National Park was "forest land" as defined in the Act; and (3) that "the fee charged for the use of the inner tube was not a fee charged" for Lisa's use of the recreational facilities.

### A. Was the Government a "Recreational Landowner"?

This court has held that "The principle of encouraging landowners to open their land by limiting potential tort liability applies with equal force to the Government as to other landowners." *Gard v. United States,* 594 F.2d 1230, 1233 (9th Cir.1979) *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).[10] Appellants do not contend that the Government is not entitled to the immunities of the Washington Recreational Land Use Act because it is a political entity, but rather because the statute applies only to "a landowner who gives up his right to keep out members of the public." They argue that the requisite element of "consent to public use"[11] is not present, noting that Olympic National Park was "reserved and withdrawn from settlement, occupancy, or disposal . . . and dedicated and set apart as a public park for the benefit and enjoyment of the people . . . ." Act of June 29, 1938, Pub.L. No. 75–778, § 1, 52 Stat. 1241 (codified at 16 U.S.C. § 251 (1976)). Appellants argue that while the purpose of the Washington statute is to "encourage" owners to "allow" someone to use their land, that purpose is not met when, as here, the public has a right and expectation to use the land that pre-exists the passage of the Act[12] and the Government has no right to bar entry.

While it is true that the Olympic National Park was open to public use prior to the passage of the Washington statute, the Government properly notes that federal regulations permit the closure of national parks by the Government. 36 C.F.R. § 2.6, (41 FR 4537, Jan. 30, 1976), reads in part:

§ 2.6 Closures and public use limits.

(a) *Closing of areas.* (1) The Superintendent may establish a reasonable schedule of visiting hours for all or portions of a park area and close to public use all or any portion of a park area when necessary for the protection of the area or the safety and welfare of persons or property by the posting of appropriate signs indicating the extent and scope of closure.

In construing a similar regulation with respect to national forests open to the public, in *Otteson v. United States,* 622 F.2d 516, 519 (10 Cir.1980),[13] the court said in part:

Plaintiff's argument that the government should not be treated as a private party under the Colorado sightseer statute because it is somehow obligated to keep the national forests open to the public is unpersuasive. The Forest Service regulations allow each Forest Supervisor, among others, to close or restrict the use of forest areas and roads. If liability were imposed upon the government in cases such as this one, the Forest Service might well choose to close the forests to public use rather than bear the heavy burden of maintaining logging roads as public thoroughfares. This result is pre-

**10.** See also *McCarver v. Manson Park & Recreation Dist.,* 92 Wash.2d 370, 597 P.2d 1362, 1365–66 (1979), where the court held the statute applicable in a suit for the death of plaintiffs' daughter, who was drowned in a pool operated by a Park and Recreation District. The court also expressly rejected plaintiffs' contention that the statute was not intended to apply to land or water used exclusively for recreational purposes.

**11.** As noted *supra,* the Act applies to public and private owners of forest lands, and rural lands adjacent thereto, "who allow members of the public to use them for the purposes of outdoor recreation."

**12.** See RCW 4.24.200 *supra.* The Act was passed in 1967. Olympic National Park was created in 1938, with the Hurricane Ridge area added to the National Park by Presidential proclamation in 1940.

**13.** In *Otteson,* plaintiff's decedent died on a Forest Service logging road. Plaintiff contended that the Colorado sightseer statute was not applicable since the purpose of the statute was to encourage private landowners to open their land, while the United States had an independent duty to maintain the national forests as public recreational areas.

cisely what the Colorado sightseer statute was enacted to prevent. Thus, we hold that the government is entitled to the protection of the Colorado sightseer statute and is therefore only liable "[f]or willful or malicious failure to guard or warn against a known dangerous condition...." Colo.Rev.Stat. 33–41–104(a) (1973).[14]

■ The same reasoning applies here. The United States could close a park or a part thereof or restrict its use. We agree with the district court that the Government was a recreational landowner under the Washington Recreational Land Use Act.

### B. Was the Land in Question "Forest Land"?

Appellants contend that the district court erroneously concluded that Olympic National Park was "forest land", and in the alternative, that a factual issue was presented which precluded summary judgment. Appellants rely on *Kucher v. Pierce County*, 24 Wash.App. 281, 600 P.2d 683 (1979), where the court held that "forest lands" did not include a wooded area in a city park administered by a city park district. The court in *Kucher* referred to a law review article [15] which suggests that three factors bear on the scope of applicability of the immunity statute: (1) the amount of land owned by the landowner, (2) the arrangement of the land and its improvements, and (3) the relative proximity of the land to a population center.

Appellants focus solely on the Hurricane Ridge area and urge it is similar to an urban park because of the improvements, patrol and accessibility. The Government focuses on the totality of the Park, noting that it covers 898,000 acres or 1,350 square miles [16] and is at least 70 miles from the

metropolitan Puget Sound area. We agree with the Government that the Park is in no sense similar to a city urban park. Under the undisputed facts, the district court properly concluded that the area where the accident occurred was a part of "forest lands".

### C. Did Lisa Pay a "Fee" for the Use of the Land?

Appellants contend that the Government received a "fee" for Lisa's use of the Park facilities. She paid NPC a dollar to rent an inner tube. NPC pays the Government a fixed rental and a percentage of its gross receipts. The district court concluded that the fee was charged for the use of the inner tube and was not a fee charged for the use of the land. We agree.

The case upon which appellants rely, *Thompson v. United States*, 592 F.2d 1104 (9 Cir.1979), is distinguishable. There the plaintiff was a participant in a motorcycle race held on federal land. The Bureau of Land Management had charged the Sportsmen Racing Association a $10.00 application service fee and a minimum rental charge of $10.00. The Association in turn charged Thompson an entry fee of $6.00. The court held that a rental fee had been charged both the Association and the rider "for the use of the land" and the California recreational use statute accordingly was not applicable. Here, however, the fee was not charged to members of the public for entry on to the land or for use of the land. Lisa paid the dollar fee to rent the tube. She entered the Park without paying a fee. She could have used the Hurricane Ridge or any other area of the Park without making any payment if she had brought her own tube. No fee was charged which would deny the United States its immunity under

---

**14.** See also *Hahn v. United States*, 493 F.Supp. 57 (M.D.Pa.1980), aff'd, 639 F.2d 773 & 777 (3 Cir.1980).

**15.** J.C. Barrett, *Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability;* 53 Wash.L.Rev. 1, 22–25 (1977).

**16.** An affidavit, which is undisputed, sets forth the scope and dimensions of the Park. The accident site, Hurricane Ridge, is a subalpine ridge top running in an east-west direction. The south slope drops 5,000 feet to the Elwha River and the north side drops in the Little River drainage 5,000 feet below. The top of the ridge is approximately 1,300 feet wide and has open meadow and subalpine fir.

the Washington Recreational Land Use Act.[17]

In holding that the land was subject to the Recreational Land Use Act, the district court found further that "there was no failure to post warnings of any artificial latent condition because the conditions were natural. There had been no change in the property and the snow and ice which accumulated there were a natural accumulation which occur over the winter's time."

#### IV. *Was the Conduct of the United States Willful or Wanton?*

The parties agree that if the Recreational Use Act is applicable, the Government's liability is measured under Washington common law definitions of willful and wanton conduct, as set forth in Washington Pattern Instruction 14.01 and in *Adkisson v. Seattle,* 42 Wash.2d 676, 258 P.2d 461 (1953). They disagree with respect to the trial court's application of those definitions to the facts of this case.

As the district court noted, Washington Pattern Instruction 14.01 defines willful misconduct as the

> intentional doing of an act ... or the intentional failure to do an act which one has the duty to do when he or she has actual knowledge of the peril that will be created and intentionally fails to avert the injury.

Wanton misconduct under the same instruction is the

> intentional doing of an act which one has a duty to refrain from doing or the intentional failure to do an act which one has the duty to do, in reckless disregard of the consequences and under such surrounding circumstances and conditions that a reasonable person would know or

should know that such conduct would in a high degree of probability result in substantial harm to another.

The court in *Adkisson,* in a detailed and careful analysis of the distinction between negligence and willful or wanton misconduct, said in part:

> Wilful or wanton misconduct is not, properly speaking, within the meaning of the term "negligence". Negligence and wilfulness imply radically different mental states. Negligence conveys the idea of neglect or inadvertence, as distinguished from premeditation or formed intention.

258 P.2d at 465.

Appellants contend that the Government's failure to place "signs or ropes to guard against the dangerous north slope" constituted willful and wanton misconduct since "the breach was a conscious and deliberate decision on the part of the Government, and that the Government knew or should have known that someone would probably come into contact with the danger."

In concluding that appellants had failed to show that the Government's conduct was willful or wanton, the district court said in part:

> The evidence established that the extent of the danger was not actually or reasonably known to the Government. Its failure to put up signs and ropes was negligence which proximately contributed to the plaintiff's accident but it did not constitute "an intentional failure to do an act" nor was it "in reckless disregard of the consequences." The National Park Rangers were justifiably concerned that the placing of signs might mislead people into going to other areas.[18] The only

---

**17.** The recent case of *Graves v. United States Coast Guard,* 692 F.2d 71 (9 Cir., 1982), is likewise distinguishable. There the plaintiff had given "money to his traveling companion, who in turn paid the government's lessee for the privilege of camping near the river." The court held that "the use of the cabana and access to the river were implied benefits received as a consequence of the payment of consideration to the campground operator." In

other words, as in *Thompson,* a consideration was paid for the *use* of the *land.*

**18.** The court found, *inter alia,* that employees of the National Park Service were aware that NPC was renting inner tubes to the public, including minors, and were aware also of accidents in the snow play and surrounding areas in connection with the use of inner tubes; that a Forest Service employee had made recommendations concerning the possible placement

prior accident in the area had been after the snow season and was not such as would alert them to the fact that the plaintiff might be injured as she was.[19] The slope itself was quite steep and the Rangers could well have thought that anyone looking at it and exercising reasonable caution would not attempt to use an inner tube on that slope.[20]

The court distinguished two cases upon which appellants rely, *Miller v. United States,* 442 F.Supp. 555 (N.D.Ill.1976), *aff'd* 597 F.2d 614 (7 Cir.1979), and *Stephens v. United States,* 472 F.Supp. 998 (C.D.Ill. 1979). As the district court noted, both "involved specific acts of the Government which created the condition resulting in the accident, accompanied with actual knowledge of the existence of the conditions." In *Miller,* the plaintiff dove from a pier into a lake, the depth of which varied as a result of the Government's lowering and raising the level of the water in the lake. In *Stephens* the plaintiff dove into a lake and hit his head on a submerged tree stump. The Government had cut the tree down and left a six inch stump and then filled the lake. In both cases a hidden condition had been created by the Government.

The other cases cited by appellants are similarly distinguishable. In *Adkisson v. Seattle, supra,* plaintiffs' automobile, after dark, had struck a pile of dirt placed in the street by the owner of property in the course of sewer and water main construction, without warning travelers. In *Greetan v. Solomon,* 47 Wash.2d 354, 287 P.2d 721 (1955), the owner of an apartment building had left an unguarded excavation

without any kind of warning, and a tenant was injured in carrying refuse to a garbage can after dark. In *McGarvey v. Seattle,* 62 Wash.2d 524, 384 P.2d 127 (1963), the plaintiff fell into a manhole in a city sidewalk left open by city employees, without barricade or warning. In each case the conduct of the defendant was "positive rather than negative."[21] The condition was created by the defendant, and the defendant had actual knowledge that the hazard existed and nevertheless failed to provide any warning.

On the other hand, as the district court found, "In this case, the condition, the natural cirque was not created by the Government and it did not reasonably know that it posed the substantial danger that we all now know exists for tubing on that slope." The court noted further that the "impact of tubing and the inherent dangers involved therein were not apparent to the public or the Government on April [1]6, 1977."

 We agree with the district court that, "While it was negligence on the Government's part not to put up signs or ropes, its failure to do so does not rise to the status of willful and wanton conduct under the law of Washington."

AFFIRMED.

---

of warning signs on the north slope and the possibility of prohibiting inner tube rentals on the ridge; that a substantial portion of the inner tubes used on Hurricane Ridge were brought by the persons using them; that the Park Service decided not to sign off the north slope because there were other slopes and if it signed off one and not the others, people would feel free to use the unsigned slopes. Subsequent to the accident, the National Park Service roped off the slope where Lisa was injured and posted a sign reading "No Sledding—Dangerous Slope," and another sign stating "Dangerous Slope—Stay Back of Rope."

19. On May 22, 1976 a person had suffered a compound fracture of a leg while inner tubing on the slope in question.

20. The court also noted that on two occasions while Lisa was tubing in the beginners' ski area, Mr. Barlow had warned her that she was tubing in a way that she might injure herself and that after the second warning Lisa and Beverly moved to the area on Hurricane Ridge.

21. As the court stated in *Adkisson,* "Wanton misconduct is not negligence since it involves intent rather than inadvertence, and is positive rather than negative." 258 P.2d at 467.