IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| JON L. WILKERSON, | ) | No. 66524-3-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | ORDER DENYING MOTION FOR |
| | ) | RECONSIDERATION AND |
| CITY OF SEATAC, | ) | AMENDING OPINION |
| | ) | |
| Respondent. | ) | |

The appellant, Jon L. Wilkerson, filed a motion for reconsideration. The

respondent City of SeaTac filed an answer. The panel having determined that the

motion should be denied but the opinion amended; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied.

IT IS FURTHER ORDERED that the opinion of this court in the above-entitled

case filed November 5, 2012, shall be amended as follows:

1. On page 3, between the second paragraph ending with the sentence: "But Wilkerson said that he had no concerns about his ability to accomplish the jump," and the third paragraph beginning with the sentence: "Wilkerson testified that he 'gauged the speed to be appropriate for the gap' and approached the jump 'moderate to fast, the speed needed to get over the gap,' " insert the following paragraph and block quote:

In his declaration in opposition to summary judgment, Wilkerson

states he "reviewed" the jump, including "the pitch of the take-off jump

itself and the size of the jump and the gap and thought everything looked ok," but "did not take a practice 'run in.' " The declaration states, in pertinent part:

14. I then rode over to a smaller jump (which had a crevice or drop in the middle) called a gap jump and felt that it was well within my "skill set";

15. I then generally reviewed the jump, including the pitch of the take-off jump itself and the size of the jump and the gap and thought everything looked ok;

16. That is, looking at the jump itself, it looked fine for me to take;

17. I did not measure the gap width, nor the pitch of the jump nor the pitch of the landing;

. . . .

23. I also did not take a practice "run in" leading up to the jump because I had no reason to think that there was some danger to me from the approach to the jump or that the approach would be problematic or prevent me from clearing the jump.

2. On page 4 in the second full paragraph, replace "Bayler Institute for Rehabilitation" with "Baylor Institute for Rehabilitation."

The remainder of this opinion shall remain the same.

Dated this 27th day of March , 2013.

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2013 MAR 27 PM 1:45

2

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JON L. WILKERSON, | ) | No. 66524-3-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CITY OF SEATAC, | ) | |
| | ) | |
| Respondent. | ) | FILED: November 5, 2012 |

SCHINDLER, J. — Jon Wilkerson challenges the decision on summary judgment to

dismiss his lawsuit against the City of SeaTac based on the recreational land use

immunity statute, RCW 4.24.200–.210. We affirm.

FACTS

The Des Moines Creek Trail Park is a 96-acre woodland preserve open to the

public for recreational use. The City of SeaTac (City) owns and operates the portion of

the park located within the City,[1] including dirt mounds in the park that bicyclists use as

bike jumps. The dirt jumps, known as "the Softies," are located about a quarter-mile off a

paved trail in the park. The City did not create or maintain the dirt jumps.

In June 2006, 30-year-old Jon Wilkerson moved from Arkansas to Kent,

Washington to work as a physical therapist. Wilkerson had plans to go mountain biking

at Whistler in British Columbia with friends in July. Wilkerson testified that he considered

---

[1] The City of Des Moines and the Port of Seattle own and operate other portions of the park.

himself an "experienced mountain biker" and had previously used BMX[2] and mountain bikes to do ramp and dirt jumps.

About a week after moving to Kent, Wilkerson went to a bike shop to buy a new helmet. Wilkerson asked the bike shop manager "about nearby parks that had dirt jumps — where I could ride my bike and practice making jumps in anticipation of [the] bike trip to Whistler with friends." The bike shop manager told Wilkerson about the Des Moines Creek Trail Park and the "BMX style dirt jump[s]," and "told [him] how to get to [the Softies]."

On June 21, Wilkerson drove to the Des Moines Creek Trail Park. Wilkerson arrived at the park between 5:00 and 6:00 p.m. and parked his Ford Expedition in the parking lot located at South 200th Street. Wilkerson left his cell phone in his car. Wilkerson testified that he went to the park that day to train and "work[] on jumps that I knew that I would need to be able to clear at Whistler. . . . I was working that day to prepare to do more advanced techniques at Whistler."

After riding around the park for about 30 to 45 minutes on "single [bike] track trails," Wilkerson testified that he followed the directions he received from the bike shop manager to get to the Softies. Wilkerson said he "rode down a ravine, crossed a creek, walked [his] bike up and the softies were on the right." When he arrived at the Softies, no one else was there.

Wilkerson testified that he examined the dirt jumps and understood the importance of the "approach speed," as well as the condition of the track and the height and pitch of the jumps. Wilkerson said that he rode his bike over the jumps to "try some of them out" before selecting a smaller "gap jump." Wilkerson said he decided the other

---

[2] (Bicycle motocross.)

jumps "weren't within my skill set" because they were "too steep" and "too close together," and concluded the smaller gap jump was "within my skill set."

The dirt jump Wilkerson selected contained "two mounds with a gap in between." Wilkerson testified that he inspected the jump before attempting it, and rode down the approach to check the pitch and surface composition.

> Q     But you did check the jump out before you went off of it, correct?
> A     I did.
> Q     And, you rode down and actually, with the intention of checking it out before you went off of it, correct?
> A     I did.
> Q     And, you were looking for things like the pitch of the jump, correct?
> A     Yes.
> Q     You were looking to see if the composition of the surfaces was adequate, correct?
> A     Yes.
> Q     You were looking to see if the jump was safe before you went off of it, correct?
> A     Yes.

Wilkerson testified that he concluded "there was enough of a grade to [carry] me into [sic] with a moderate to fast amount of speed." Wilkerson admitted that it had been at least a couple of years "since I'd done a gap jump." But Wilkerson said that he had no concerns about his ability to accomplish the jump.

Wilkerson testified that he "gauged the speed to be appropriate for the gap" and approached the jump "moderate to fast, the speed needed to get over the gap." Wilkerson missed the jump and "[t]umbled forward" over the front of the bike. Wilkerson testified, in pertinent part:

> On the back side of the jump for some reason my back wheel didn't make it all the way over the berm of the back side of the jump. So, it impacted the top of the berm, rebounded and knocked me over the front of the bicycle.

Wilkerson hit the ground head-first and landed on his back five or six feet beyond the jump. Wilkerson was unable to move. Wilkerson called for help for some time before losing consciousness.

At about 1:00 a.m., a City employee reported seeing Wilkerson's car in the parking lot. Two bicyclists found Wilkerson at about 11:00 a.m. and called 911. Emergency personnel immediately responded and transported Wilkerson to Harborview Medical Center. Wilkerson suffered from hypothermia and went into cardiac arrest. During "life-saving efforts," Wilkerson's lung was lacerated. Wilkerson successfully underwent surgery for the laceration. The doctors at Harborview diagnosed Wilkerson with a C4-C6 vertebra fracture. Wilkerson is quadriplegic.

After an assessment in Arkansas in September 2006, Wilkerson participated in the program at the Bayler Institute for Rehabilitation in Texas. During the assessment, Wilkerson said that although he was an experienced mountain biker, as he went over the jump, he came down "wrong" because he " 'was a bit out of practice' " and " 'a little too bold.' "

Wilkerson filed a lawsuit against the City alleging the City breached the duty to use reasonable care in failing to maintain the park and "allowing man-made jumps to remain despite the . . . inherent danger the jumps posed." The complaint also alleged the City breached the duty to supervise the park and report Wilkerson's vehicle "to authorities." Wilkerson claimed the failure to report seeing his car in the parking lot caused him to suffer hypothermia and injury to his lungs. The City denied the allegations and asserted a number of affirmative defenses, including immunity under the recreational land use statute, RCW 4.24.200–.210.

The City filed a motion for partial summary judgment to dismiss the claim that the City breached the duty to remove the dirt jumps. The City argued that because there was no evidence of a known dangerous artificial latent condition, the claim was barred by the recreational land use statute.

Wilkerson argued there were genuine issues of material fact as to whether the approach to the gap jump was a known dangerous artificial latent condition. Wilkerson also argued that the City's failure to remove, redesign, or maintain the dirt jumps was "willful and wanton conduct [that] rises to the level of intentional conduct."

In support of his argument that the approach to the gap jump was a latent condition, Wilkerson submitted the declarations of Samuel Morris, Jr., a professional mountain bike racer; Lee Bridgers, the owner of a company that conducts mountain bike jumping clinics; and his own declaration.[3]

In his declaration, Wilkerson states that he did not "see[] or appreciate[] the S-curved, angled lead-in to the jump." Morris states that in his opinion,

> it was not the jump itself that caused Jon to crash, but the curvy nature of the lead-in, or approach, to the jump, which more probably than not reduced his speed enough to prevent him from successfully completing the jump. . . . While Jon testified that he reviewed the size of the gap and the pitch of the jump, what he did not consider and what a beginner to even an intermediate jumper would mostly likely not consider because of the subtleness is the curved approach leading into the jump and the effect that the approach would have on the ability of the rider to complete the jump. These conditions would not be apparent to a rider of Jon's skill level.

Bridgers testified that the cause of the crash was the "lack of speed due to the twists and turns in the approach."

[T]he curvy lead-in to the jump prevented Jon from successfully attaining

---

[3] In support of his assertion that the approach to the gap jump was a "known" and "dangerous" condition, Wilkerson submitted excerpts from the deposition of the City's Acting Fire Chief and incident reports of bicycle accidents.

the speed necessary to complete the jump and was the primary cause of Jon's injury.

Bridgers stated that in his opinion, Wilkerson did not appreciate the S-curve approach.

> While the S-curve after the berm is not visibly dramatic, it affects the direction, physics, and speed of the rider attempting to take the jump and therefore has a significant impact on the rider's ability to successfully clear the jump, especially on a first attempt. This is something that Jon obviously did not notice or appreciate and which clearly had an impact on his ability to make the jump.

The court granted the motion for partial summary judgment. Even assuming the effect of the S-curve approach to the jump was not readily apparent to Wilkerson, the court concluded it was not a latent condition. The court ruled that as a matter of law, the inability to appreciate the risk does not constitute a latent condition.

> So for purposes of the summary judgment, I am assuming that the trail, the approach leading to the jump was curved in some fashion such that it would have limited the speed of a biker who arrived at the jump site.
>
> I am going to further conclude, for purposes of the summary judgment, that it would not have been readily apparent to the biker that he could not acquire sufficient speed to clear the jump.
>
> [T]here is no testimony that you couldn't see the path. The path was there. The path was not submerged; it was not invisible. Whether it was straight or curved, it was the path that one could see.
>
> . . . .
>
> [T]here are no cases where the courts have said you can look directly at it, you can see what is there to be seen, and the inability to appreciate the risk posed constitutes latency. I didn't see any cases like that.
>
> I find as a matter of law that the lead up, whether it was curved or straight, is not the latent condition required under the statute, and it does not abrogate the statutory immunity.

The court also concluded there was no evidence that the City acted with willful and wanton disregard for a danger posed by the Softies.

> I would also suggest that there is no evidence here that would rise to the level of willful and wanton disregard, if indeed that is the standard in Washington.
>
> I will accept for a summary judgment proposition that the city knew or should have known these jumps were out there, they knew or should

have known that they were dangerous and there have been prior accidents, and that they did not go in and sign it or remov[e them i]s not the standard for recreational use immunity.

The "Order Granting Defendant SeaTac's Motion for Summary Judgment Re: Recreational Use Immunity" dismisses the claim that "the City of SeaTac owed [Wilkerson] a duty to protect him from his failed mountain bike jump" at the Des Moines Creek Trail Park. The court denied Wilkerson's motion for reconsideration.

The City then filed a motion for summary judgment dismissal of Wilkerson's claim that the City breached the duty to supervise the park and report seeing Wilkerson's vehicle in the parking lot. The City argued that the recreational land use statute and the public duty doctrine barred these claims.

Wilkerson argued the recreational land use statute did not apply to the cardiac and lung injuries he suffered as a result of remaining in the park overnight because he was no longer engaged in recreation. Wilkerson also argued that the City assumed a duty to users of the park to exercise reasonable care in patrolling the park.

The court granted summary judgment. The court ruled that the recreational land use statute barred Wilkerson's claim that the City was liable for the injuries Wilkerson suffered as a result of the crash. The court's oral ruling states, in pertinent part:

> I mean to suggest that a landowner is immune from someone using their land for recreation, but if they get hurt, then a new duty arises to come take care of them and to use reasonable efforts to make sure they are safe after they are injured, as opposed to being safe before they are injured, really stretches it too far.
> [T]o suggest the landowner has a duty not to protect the person from injury, but to treat them after they are injured, or to be alert to the fact of injury, even though they are not alert to prevent the injury, makes no sense.
> So I am ruling that in the circumstances of having failed to detect him injured on site and failed to having brought medical services to him fast

7

enough, the city is still acting in its capacity as landowner.

The "Order Granting Defendant SeaTac's Motion for Summary Judgment Re: Duty to Rescue" dismisses Wilkerson's claim that the City "owed him a duty to supervise and rescue him sooner."[4]

## ANALYSIS

Wilkerson contends the trial court erred in dismissing his negligence claims against the City under the recreational land use immunity statute, RCW 4.24.200–.210, and the court erred in concluding that the statute barred his claim for "hypothermia and cardiac and lung injuries."

We review summary judgment de novo and consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Bulman v. Safeway, Inc., 144 Wn.2d 335, 351, 27 P.3d 1172 (2001). A party cannot rely on allegations in the pleadings, speculation, or argumentative assertions that factual issues remain. White v. State, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

The recreational land use statute, RCW 4.24.200–.210, grants immunity to landowners for unintentional injuries to recreational users of the land.

The statute modifies a landowner's common law duty in order "to encourage landowners to open their lands to the public for recreational purposes." Davis v. State, 144 Wn.2d 612, 616, 30 P.3d 460 (2001). Because the recreational land use statute is

---

[4] Wilkerson filed a motion to compel the City to produce discovery, which the court denied. Wilkerson appeals the order denying the motion to compel but does not assign error to the order or address it in the briefs. Accordingly, the issue is waived. RAP 10.3(a)(4); Hollis v. Garwall, Inc., 137 Wn.2d 683, 689 n.4, 974 P.2d 836 (1999).

No. 66524-3-I/9

in derogation of common law, it is strictly construed. <u>Matthews v. Elk Pioneer Days</u>, 64 Wn. App. 433, 437, 824 P.2d 541 (1992).

Under RCW 4.24.200, the purpose of the recreational land use statute is to

> encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon.[5]

Under RCW 4.24.210, a landowner is immune from liability for unintentional injuries unless the injury is caused by a known dangerous artificial latent condition "for which warning signs have not been conspicuously posted." RCW 4.24.210 states, in pertinent part:

> (1) [A]ny public or private landowners . . . or others in lawful possession and control of any lands whether designated resource, rural, or urban, or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation, which term includes, but is not limited to, . . . bicycling, . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.
>
> . . . .
>
> (4)(a) Nothing in this section shall prevent the liability of a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted.

To establish the City was not immune from suit under RCW 4.24.210, Wilkerson must show the City charged a fee for the use of the land, the injuries were intentionally inflicted, or the injuries were sustained by reason of a known dangerous artificial latent condition for which no warning signs were posted. <u>Davis</u>, 144 Wn.2d at 616.

Here, there is no dispute that the Des Moines Creek Trail Park was open to the public for recreational purposes and no fee was charged. The parties dispute whether

---

[5] The legislature amended the statute several times between 2006 and 2012. Laws of 2006, ch. 212, § 6; Laws of 2011, ch. 53, § 1; Laws of 2011 ch. 171, § 2; Laws of 2011 ch. 320, § 11; Laws of 2012 ch. 15, § 1. The amendments are not pertinent to this appeal.

9

the injury-causing condition was latent. Each of the four elements of a known dangerous artificial latent injury-causing condition must be present in order to establish liability under the recreational land use statute. Ravenscroft v. Wash. Water Power Co., 136 Wn.2d 911, 920, 969 P.2d 75 (1998). "If one of the four elements is not present, a claim cannot survive summary judgment." Davis, 144 Wn.2d at 616.

Wilkerson asserts there are genuine issues of material fact as to whether the S-curve lead-in was a latent condition, and whether a recreational user would recognize the danger of the S-curve approach. Wilkerson contends the S-curve "lead-in to the jump" caused his injuries.

For purposes of the recreational land use statute, RCW 4.24.210, "latent" means " 'not readily apparent to the recreational user.' " Ravenscroft, 136 Wn.2d at 924 (quoting Van Dinter v. City of Kennewick, 121 Wn.2d 38, 45, 846 P.2d 522 (1993)). In determining whether the injury-causing condition is latent, the question is not whether the specific risk is readily apparent but, instead, whether the injury-causing condition itself is readily apparent. Ravenscroft, 136 Wn.2d at 924. A landowner will not be held liable where a patent condition posed a latent, or unobvious, danger. Van Dinter, 121 Wn.2d at 46. Although latency is a factual question, when reasonable minds could reach but one conclusion from the evidence presented, summary judgment is appropriate. Van Dinter, 121 Wn.2d at 47.

Even viewing the evidence in the light most favorable to Wilkerson, as a matter of law, the S-curve lead-in was not a latent condition. At most, the S-curve approach is a patent condition that "posed a latent, or unobvious, danger." Van Dinter, 121 Wn.2d at 46.

10

In <u>Van Dinter</u>, the Washington Supreme Court addressed the difference between a latent <u>condition</u> and a latent <u>danger</u>. In <u>Van Dinter</u>, Van Dinter struck his eye on a protruding metal antenna of a caterpillar-shaped playground toy located next to the grassy area at the park where he was engaged in a water fight. <u>Van Dinter</u>, 121 Wn.2d at 40. Van Dinter stated that "he did not realize someone on the grass could collide with any part of the caterpillar." <u>Van Dinter</u>, 121 Wn.2d at 40. Van Dinter asserted "a condition is latent for purposes of RCW 4.24.210 if its injury-producing aspect is not readily apparent to the ordinary recreational user," and argued that "while the caterpillar was obvious, its injury-causing aspect was not." <u>Van Dinter</u>, 121 Wn.2d at 45.

The court disagreed with Van Dinter and held that "RCW 4.24.210 does not hold landowners potentially liable for patent conditions with latent dangers. The condition itself must be latent." <u>Van Dinter</u>, 121 Wn.2d at 46. While the court expressly acknowledged that "it may not have occurred to Van Dinter that he could injure himself in the way he did," the court concluded that "this does not show the injury-causing condition — the caterpillar's placement — was latent. . . . The caterpillar as well as its injury-causing aspect — its proximity to the grassy area — were obvious." <u>Van Dinter</u>, 121 Wn.2d at 46.

Here, Wilkerson's experts testified that the danger posed by the S-curve approach was not "obvious" to "beginning to intermediate" bike jumpers.

> [T]he S-curve . . . affects the direction, physics, and speed of the rider attempting to take the jump . . . . It is my opinion that <u>the dangers posed</u> by the S-curved lead-in to the jump <u>were not obvious</u> for [Wilkerson] and other beginning to intermediate jumpers.[6]

---

[6] (Emphases added.)

Morris testified that it was unlikely that Wilkerson or other jumpers would "consider . . . the effect that the approach would have."

> While [Wilkerson] testified that he reviewed the size of the gap and the pitch of the jump, what he <u>did not consider</u> and what a beginner to even an intermediate jumper would most likely not consider because of the subtleness is the curved approach leading into the jump and <u>the effect that the approach would have</u> on the ability of the rider to complete the jump.[7]

The testimony that Wilkerson did not "appreciate" the danger of the S-curve approach to the jump does not establish a latent condition. As in <u>Van Dinter</u>, at most, Wilkerson's failure to "appreciate" the S-curve lead-in "shows that the present situation is one in which a patent condition posed a latent, or unobvious, danger." <u>Van Dinter</u>, 121 Wn.2d at 46.

The cases Wilkerson relies on, <u>Ravenscroft</u> and <u>Cultee v. City of Tacoma</u>, 95 Wn. App. 505, 977 P.2d 15 (1999), are distinguishable. In <u>Ravenscroft</u>, a man was injured when the boat he was riding in hit a rooted tree stump submerged in a channel of water that formed part of a dam reservoir. <u>Ravenscroft</u>, 136 Wn.2d at 915. The driver of the boat testified that "he saw nothing that would indicate the presence of any submerged objects or hazards in the direction he was traveling." <u>Ravenscroft</u>, 136 Wn.2d at 916. Other witnesses testified that other boats had hit the stumps. <u>Ravenscroft</u>, 136 Wn.2d at 925.

The court identified the injury-causing condition as the "man-created water course, containing a submerged line of tree stumps" that was "created by [the Washington Water Power Company] cutting down trees, leaving stumps near the middle of a water channel, then raising the river to a level which covered the stumps." <u>Ravenscroft</u>, 136 Wn.2d at 923. The court concluded that summary judgment was not

---

[7] (Emphases added.)

12

appropriate because "[t]he record does not support a conclusion that the submerged stumps near the middle of the channel were obvious or visible as a matter of law." Ravenscroft, 136 Wn.2d at 926.

In Cultee, a five-year-old girl rode a bicycle on a road with an eroded edge that was partially flooded by the Hood Canal tidal waters. Cultee, 95 Wn. App. at 509. The girl fell into the water and drowned at a point where the road and the eroded edge were covered by two to four inches of muddy water and the adjacent fields were covered with several feet of water. Cultee, 95 Wn. App. at 510. The court held there were material issues of fact about whether the condition that killed the girl was "the depth of the water alone, or a combination of the muddy water obscuring the eroded edge of the road and an abrupt drop into deep water;" and whether " 'recreational users' would have been able to see the edge of the road, given that it was eroded and covered with a two-to-four-inch layer of muddy water." Cultee, 95 Wn. App. at 523.

Wilkerson also argues that the trial court erred in concluding the recreational land use statute bars his claim for cardiac and lung injuries. Wilkerson argues the statute does not apply to the injuries he suffered after he missed the jump because he was not "engaged in recreation" or "using" the land when he suffered cardiac and lung injuries.

Wilkerson relies on Wisconsin law in support of his argument that the recreational land use statute does not apply to secondary injuries. But unlike RCW 4.24.210(1), the Wisconsin statute predicates landowner immunity on recreational use. The Wisconsin statute states, in pertinent part: "[N]o owner . . . is liable for . . . any injury to . . . a person engaging in recreational activity on the owner's property." WIS. STAT. § 895.52(2)(b). By contrast, RCW 4.24.200–.210 grants a broader immunity to landowners "who allow members of the public to use [their lands] for the purposes of outdoor recreation." RCW

4.24.210(1); see also Gaeta v. Seattle City Light, 54 Wn. App. 603, 608-10, 774 P.2d 1255 (1989) (because landowner "open[ed] up the lands for recreational use without a fee," and thereby "brought itself under the protection of the immunity statute," landowner was immune from liability regardless of whether "a person coming onto the property may have some commercial purpose in mind").

Next, Wilkerson argues that the City's willful and wanton or intentional conduct precludes immunity under the recreational land use statute because the City knew that other bicyclists had been injured. Jones v. United States, 693 F.2d 1299 (9th Cir. 1982), does not support Wilkerson's argument.

In Jones, the plaintiff went to Hurricane Ridge located in Olympic National Park as part of a church-sponsored event. Jones, 693 F.2d at 1300. The plaintiff was severely injured while riding on an inner tube at Hurricane Ridge. Jones, 693 F.2d at 1300. The plaintiff sued the church and the federal government. Jones, 693 F.2d at 1300. The jury returned a verdict against the church but found the plaintiff was also negligent. Jones, 693 F.2d at 1301. The trial court entered judgment in favor of the federal government under Washington's recreational land use statute on the grounds that the plaintiff did not establish the government's conduct was willful or wanton. Jones, 693 F.2d at 1300-01.[8]

On appeal, the plaintiff argued the court erred in concluding the government's conduct was not willful or wanton under the recreational land use statute. Jones, 693 F.2d at 1301. The plaintiff asserted that the government's failure to " 'put up signs and

---

[8] The evidence established that the extent of the danger was not actually or reasonably known to the Government. Its failure to put up signs and ropes was negligence which proximately contributed to the plaintiff's accident but it did not constitute "an intentional failure to do an act" nor was it "in reckless disregard of the consequences."
Jones, 693 F.2d at 1304 (internal quotation marks omitted).

ropes' " was deliberate and the government " 'knew or should have known' " of the dangerous condition. Jones, 693 F.2d at 1304.

The Ninth Circuit affirmed. Jones, 693 F.2d at 1305. The Court distinguished cases that involved specific acts of the government that create a dangerous condition, and held that " '[w]anton misconduct is not negligence since it involves intent rather than inadvertence, and is positive rather than negative.' " Jones, 693 F.2d at 1305 n.21 (quoting Adkisson v. City of Seattle, 42 Wn.2d 676, 687, 258 P.2d 461 (1953)). Because the government did not create the injury-causing condition, and the " 'impact of tubing and the inherent dangers . . . were not apparent to the public or the Government,' " the Court concluded the failure to put up signs or ropes was not intentional and willful or wanton conduct under the recreational land use statute. Jones, 693 F.2d at 1305.

> We agree with the district court that, "While it was negligence on the Government's part not to put up signs or ropes, its failure to do so does not rise to the status of willful and wanton conduct under the law of Washington."

Jones, 693 F.2d at 1305.

Here, as in Jones, there is no dispute that the City did not create the dirt jumps or S-curve approach. While the alleged failure of the City to "bulldoze the Softies" or post warning signs may constitute negligence, it is not willful or wanton conduct under the recreational land use immunity statute.

Wilkerson also claims the City assumed a duty to supervise and patrol the park. Wilkerson points to the sign the City posted in the parking lot and the failure to take some action after the City employee saw his car in the parking lot at 1:00 a.m. The sign

posted at the entry to the Des Moines Creek Trail Park parking lot stated:

> Park is patrolled by City of SeaTac Police Department . . .
> Park is operated by City of SeaTac Parks & Recreation Department . . .
> . . . .
> Park is closed from dusk to dawn unless otherwise posted
> . . . .
> Parking . . . is only permitted during park hours.
> . . . .
> Unauthorized vehicles will be impounded.

But in order to establish liability, Wilkerson must show there is a duty owed to him and not a duty owed to the public in general. <u>Babcock v. Mason County Fire Dist. No. 6</u>, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001).

> "Under the public duty doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (i.e., a duty to all is a duty to no one)."

<u>Babcock</u>, 144 Wn.2d at 785 (quoting <u>Taylor v. Stevens County</u>, 111 Wn.2d 159, 163, 759 P.2d 447 (1988)[9]). Because the record shows that the City did not assume a duty or make express assurances to Wilkerson, the public duty doctrine bars his claim that the City owed him a duty of care. <u>Babcock</u>, 144 Wn.2d at 785-86.

We affirm dismissal of Wilkerson's lawsuit against the City.

_____

WE CONCUR:

_____          _____

[9] (Internal quotation marks and citation omitted.)

16